# NO. 23-2020

## In The United States Court Of Appeals For The Fourth Circuit

**MICHAEL A. NAIMOLI, JR.; MORGAN FRENCH;
ANDREW COLLINS; MARISSA SANTARLASCI,**

*Plaintiffs - Appellees,*

v.

**PRO-FOOTBALL, INC.,** now known as Pro-Football LLC, a/k/a
**Washington Commanders Football Team,** f/k/a Washington Football Team, f/k/a
Washington Redskins Football Team; **WFI STADIUM INC.,** now known as
WFI Stadium LLC, f/k/a JKC Stadium, Inc.; **CONTEMPORARY
SERVICES CORPORATION,**

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT
_____

OPENING BRIEF OF DEFENDANTS-APPELLANTS
PRO-FOOTBALL, INC., WFI STADIUM INC.,
and CONTEMPORARY SERVICES CORPORATION
_____

Joe G. Hollingsworth
Grant W. Hollingsworth
Brett S. Covington
HOLLINGSWORTH LLP
1350 I Street, NW
Washington, DC  20005
(202) 898-5800

*Counsel for Appellants
    Pro-Football, Inc. & WFI Stadium Inc.*

Paul Finamore
Halle P. Gray
PESSIN KATZ LAW, P.A.
10500 Little Patuxent Parkway
Suite 650
Columbia, MD  21044
(410) 740-3170

*Counsel for Appellants
    Pro-Football, Inc. & WFI Stadium Inc.*

M. Patrick Gallagher
MARTELL, DONNELLY,
    GRIMALDI & GALLAGHER, P.A.
11222 York Road
2nd Floor
Hunt Valley, MD  21030
(410) 771-0800

*Counsel for Appellant
    Contemporary Services Corporation*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-2020     Caption: Naimoli, et al. v. Pro-Football, Inc., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Pro-Football, Inc. and WFI Stadium Inc.

(name of party/amicus)

who is _____Appellants_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☑ YES ☐ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   Pro-Football, Inc. recently converted to a limited liability company and is now known as Pro-Football LLC, and WFI Stadium Inc. also recently converted to a limited liability company and is now known as WFI Stadium LLC. Scoreboard HoldCo LLC is the parent company for Pro-Football LLC and WFI Stadium LLC.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brett Covington                           Date:      10/06/2023

Counsel for: Pro-Football, Inc.; WFI Stadium Inc.

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-2020    Caption: Naimoli, et al. v. Pro-Football, Inc., et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Contemporary Services Corporation
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.   Does party/amicus have any parent corporations?   ☑ YES ☐ NO
     If yes, identify all parent corporations, including all generations of parent corporations:

     Event Services America, Inc. is a corporation organized under the laws of the State of Florida with its principal place of business in Florida.  Event Services America, Inc. owns all of Contemporary Services Corporation's stock.

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
     If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____10/13/2023_____

Counsel for: Contemporary Services Corporation

- 2 -

Print to PDF for Filing

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT .......................................................5

STATEMENT OF THE ISSUES...........................................................6

STATEMENT OF THE CASE..............................................................7

    I.      PLAINTIFFS' TICKET LICENSES INCLUDED A
           MANDATORY AGREEMENT TO ARBITRATE ALL
           CLAIMS RELATED TO THE TICKET OR GAME.........................7

    II.     PLAINTIFFS REPEATEDLY CHANGED THEIR STORY IN
           THE MIDDLE OF BRIEFING ABOUT THE PURCHASE
           AND USE OF THEIR TICKETS ........................................9

    III.    TO DOWNLOAD THE TICKETS USED BY PLAINTIFFS,
           GORDON REPEATEDLY HAD TO AGREE TO THE Ts&Cs .......10

           A.     Gordon Agreed To The Ts&Cs When He Signed In To
                 His Online Account And Advanced Past The Sign In
                 Page ........................................................................11

           B.     Gordon Agreed To The Ts&Cs A Second Time When He
                 Clicked The "Agree" Button......................................13

           C.     Gordon Had Further Notice Of The Ts&Cs Through His
                 Use Of The Electronic Tickets In His Apple Wallet ...............15

    IV.    PLAINTIFFS RECEIVED THE FULL AND DIRECT
           BENEFITS PROVIDED BY THE TICKET LICENSES...................15

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT ..................................................................................17

STANDARD OF REVIEW ...........................................................................17

DISCUSSION ...........................................................................................18

I.     THE ARBITRABILITY OF PLAINTIFFS' CLAIMS IS
GOVERNED BY THE FEDERAL COMMON LAW
SUPPORTING THE FAA ...............................................................19

II.    PLAINTIFFS ARE EQUITABLY ESTOPPED UNDER
FEDERAL LAW FROM REPUDIATING THE
ARBITRATION CLAUSE BECAUSE THEY
RECEIVED THE FULL AND DIRECT BENEFITS OF
THE TICKET LICENSE ...................................................................22

III.   UNDER MARYLAND LAW, THE RESULTS ARE
THE SAME – PLAINTIFFS ARE ESTOPPED FROM
REPUDIATING THE ARBITRATION CLAUSE .................24

IV.   PLAINTIFFS ALSO ARE BOUND BY THE
ARBITRATION CLAUSE UNDER FEDERAL
COMMON LAW AGENCY PRINCIPLES ............................26

      A.     Federal Common Law Determines Gordon's
Apparent Authority To Bind Plaintiffs ...........................27

      B.     The District Court Erred By Relying On A
Judicially Created State Rule That Is Preempted
By The FAA ...................................................................31

      C.     The Undisputed Material Facts Show That Gordon
Had Constructive Notice Of The Arbitration
Agreement ......................................................................35

            1.     Sign In Page .........................................................35

            2.     Pop-Up Window Page ..........................................38

            3.     Apple Wallet .........................................................41

V.     PLAINTIFFS ARE BOUND BY THE ARBITRATION CLAUSE AS THIRD-PARTY BENEFICIARIES OF THE TICKET LICENSES ........................................................42

VI.     ALTERNATIVELY, THE COURT SHOULD REVERSE THE DISTRICT COURT'S ORDER AND REMAND WITH INSTRUCTION FOR LIMITED DISCOVERY ...........................................................44

VII.     CSC HAD STANDING TO JOIN IN THE MOTION.............45

CONCLUSION ........................................................................46

STATEMENT REGARDING ORAL ARGUMENT ...........................................46

CERTIFICATE OF COMPLIANCE .......................................................48

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*120 W. Fayette St., LLLP v. Mayor of Balt.*,
    43 A.3d 355 (Md. 2012) ...............................................................................43

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*,
    675 F.3d 355 (4th Cir. 2012) ........................................................................28

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999) ...................................................................23, 24

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................................36

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009)......................................................................................25

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011)................................................................................21, 32

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006)......................................................................................31

*Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*,
    252 F.3d 707 (4th Cir. 2001) ........................................................................18

*Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*,
    807 F.3d 553 (4th Cir. 2015) ..................................................................17, 18

*Ciliberto v. Carnival Cruise Lines, Inc.*,
    No. 85–4017, 1986 WL 2560 (E.D. Pa. Feb. 25, 1986)...............................28

*Cmty. for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989)......................................................................................26

*Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*,
752 A.2d 265 (Md. Ct. Spec. App. 2000)......................................................43

*Crawford v. Beachbody, LLC*,
No. 14-cv-1583-GPC (KSC),
2014 WL 6606563 (S.D. Cal. Nov. 5, 2014).................................................37

*CTI/DC, Inc. v. Selective Ins. Co. of Am.*,
392 F.3d 114 (4th Cir. 2004) .........................................................................35

*Deans v. CSX Transp., Inc.*,
152 F.3d 326 (4th Cir. 1998) .........................................................................18

*DeCarlo v. Italian Line*,
416 F. Supp. 1136 (S.D.N.Y. 1976) ..............................................................28

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*,
9 F.3d 1060 (2d Cir. 1993) ............................................................................23

*Dickerson v. Longoria*,
995 A.2d 721 (Md. 2010) ........................................................32, 33, 34, 43

*Dillon v. BMO Harris Bank, N.A.*,
787 F.3d 707 (4th Cir. 2015) .........................................................................44

*Dist. Moving & Storage Co. v. Gardiner & Gardiner, Inc.*,
492 A.2d 319 (Md. Ct. Spec. App. 1985)......................................................42

*Dist. Moving & Storage, Inc. v. Fedco Sys., Inc.*,
508 A.2d 487 (Md. 1986) ..............................................................................43

*E.I. DuPont de Nemours v. Rhone Poulenc Fiber & Resin Intermediates*,
269 F.3d 187 (3d Cir. 2001) ..........................................................................23

*EEOC v. Freeman*,
961 F. Supp. 2d 783 (D. Md. 2013), *aff'd in part sub nom.*,
*EEOC v. Freeman*,
778 F.3d 463 (4th Cir. 2015) ......................................................... 32-33

*First Options of Chi., Inc. v. Kaplan*,
514 U.S. 938 (1995)......................................................................35

*Fusha v. Delta Airlines, Inc.*,
No. RDB-10-2571, 2011 WL 3849657 (D. Md. Aug. 30, 2011)............39, 40

*Giles v. Nat'l R.R. Passenger Corp.*,
59 F.4th 696 (4th Cir. 2023)........................................................41

*Gomez v. Royal Caribbean Cruise Lines*,
964 F. Supp. 47 (D.P.R. 1997)......................................................28

*Griggs v. Evans*,
43 A.3d 1081 (Md. Ct. Spec. App. 2012)..............................25, 43

*Hodgin v. UTC Fire & Sec. Americas Corp.*,
885 F.3d 243 (4th Cir. 2018)........................................................26

*Holloman v. Cir. City Stores, Inc.*,
894 A.2d 547 (Md. 2006).............................................................36

*Holmes v. Coverall N. Am., Inc.*,
649 A.2d 365 (Md. 1994).............................................................25

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
206 F.3d 411 (4th Cir. 2000)...............................................*passim*

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
863 F.2d 315 (4th Cir. 1988)........................................................45

*Jackson v. World Wrestling Entm't, Inc.*,
No. 4:23-CV-0172-P,
2023 WL 3326115 (N.D. Tex. May 9, 2023).............................29, 30, 31, 42

*Kientzler v. Sun Line Greece Shipping Co.*,
779 F. Supp. 342 (S.D.N.Y. 1991)................................................28

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
    581 U.S. 246 (2017)................................................................32, 34

*Long v. Silver*,
    248 F.3d 309 (4th Cir. 2001) ........................................................45

*Lovell Land, Inc. v. State Highway Admin.*,
    969 A.2d 284 (Md. 2009) ..............................................................44

*LTVN Holdings LLC v. Odeh*,
    No. CCB-09-0789, 2009 WL 3736526 (D. Md. Nov. 5, 2009) ....................39

*Lyles v. Chegg, Inc.*,
    No. RDB-19-3235, 2020 WL 1985043 (D. Md. Apr. 27, 2020).............37, 38

*Lyons v. PNC Bank, Nat'l Ass'n*,
    26 F.4th 180 (4th Cir. 2022) ..........................................................17

*MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*,
    268 F.3d 58 (2d Cir. 2001) ............................................................22

*Marshall v. Cap. View Mut. Homes*,
    No. CIV. RWT-12-3109, 2013 WL 3353752 (D. Md. July 2, 2013)............32

*Melo v. Zumper, Inc.*,
    439 F. Supp. 3d 683 (E.D. Va. 2020) ............................................36

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ............................................................37

*Meyers v. Lamer*,
    743 F.3d 908 (4th Cir. 2014) ........................................................41

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)............................................................................45

*Muriithi v. Shuttle Exp., Inc.*,
    712 F.3d 173 (4th Cir. 2013) ........................................................17

*Nader v. Blair*,
    549 F.3d 953 (4th Cir. 2008) ........................................................18

*Naimoli v. Pro-Football, Inc.*,
   No. TDC-22-2276, 2023 WL 5985256,
   --- F. Supp. 3d ---- (D. Md. Sept. 14, 2023) .........................................*passim*

*R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*,
   384 F.3d 157 (4th Cir. 2004) ..................................................................*passim*

*Randolph v. RRR Bowie, LLC*,
   No. 22-CV-2150-PX, 2023 WL 7110516 (D. Md. Oct. 27, 2023) ..............36

*Rankin v. Brinton Woods of Frankford, LLC*,
   211 A.3d 645 (Md. Ct. Spec. App. 2019)................................................32, 34

*Rogers v. Tug Hill Operating, LLC*,
   76 F.4th 279 (4th Cir. 2023) ........................................................................25

*Rota-McLarty v. Santander Consumer USA, Inc.*,
   700 F.3d 690 (4th Cir. 2012) ........................................................................17

*Rountree v. Fairfax Cty. Sch. Bd.*,
   933 F.2d 219 (4th Cir. 1991) ........................................................................40

*Scherk v. Alberto–Culver Co.*,
   417 U.S. 506 (1974)......................................................................................28

*Selden v. Airbnb, Inc.*,
   4 F.4th 148 (D.C. Cir. 2021).........................................................................37

*Starke v. Gilt Groupe, Inc.*,
   No. 13 Civ. 5497(LLS), 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) .......37

*Thomson–CSF, S.A. v. Am. Arbitration Ass'n*,
   64 F.3d 773 (2d Cir. 1995) ...........................................................................20

*UBS Fin. Servs., Inc. v. Carilion Clinic*,
   706 F.3d 319 (4th Cir. 2013) ........................................................................21

*United Steelworkers v. Warrior Gulf Navigation Co.*,
    363 U.S. 574 (1960)......................................................................20

*Wachovia Bank, Nat'l Ass'n v. Schmidt*,
    445 F.3d 762 (4th Cir. 2006) ......................................................26

*Washington Square Secs., Inc. v. Aune*,
    385 F.3d 432 (4th Cir. 2004) ..................................................3, 21

*Wells v. Chevy Chase Bank, F.S.B.*,
    768 A.2d 620 (Md. 2001) ............................................................43

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) ......................................................20

*Whiteside v. Teltech Corp.*,
    940 F.2d 99 (4th Cir. 1991) ........................................................19

*Williams v. Dimensions Health Corp.*,
    279 A.3d 954 (Md. 2022) ............................................................33

*Williamsport Realty, LLC v. LKQ Penn-Mar, Inc.*,
    No. 3:14-CV-118, 2015 WL 2354598 (N.D. W. Va. May 15, 2015) ...........45

*Woodson v. Allstate Ins. Co.*,
    855 F.3d 628 (4th Cir. 2017) ..................................................4, 34

**Statutes:**

9 U.S.C. §§ 1-16 ("FAA") ...............................................................*passim*

9 U.S.C. § 2 ................................................................................31, 32

9 U.S.C. § 4 ....................................................................................45

9 U.S.C. § 16(a)(1)(C) .......................................................................6

28 U.S.C. § 1332................................................................................6

**Rules:**

4th Cir. Loc. R. 34(a) ...........................................................46

Fed. R. Civ. P. 12(b)(1) ...................................................18, 46

Fed. R. Civ. P. 12(b)(3) ...................................................18, 46

Fed. R. Civ. P. 12(b)(6) ...................................................18, 46

**Other Authorities:**

Restatement (Third) of Agency § 2.03 ...........................29, 33

Restatement (Third) of Agency § 2.03(c) ..............................27

Restatement (Third) of Agency § 5.03 ...........................27, 31

Restatement (Third) of Agency § 5.03 cmt. b .......................27

Washington Commanders, *The Washington Football
Team is now the Washington Commanders* (Feb. 2, 2022),
*available at* https://www.commanders.com/news/the-washington-
football-team-is-now-the-washington-commanders ..................................1

## **INTRODUCTION**

This appeal concerns whether fans entering a stadium pursuant to an electronic ticket license can disavow the terms of that ticket license, including an arbitration clause, in contravention of long-standing judicial recognition that ticket terms are enforceable and the broad public policy protecting arbitration agreements enshrined in the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA").

Today, anyone attending a sporting event, theme park, concert, or performance is likely entering the venue with an electronic ticket. These tickets are efficiently and conveniently purchased online and typically require agreement to terms and conditions. Prior to electronic ticketing, such terms and conditions were printed on the back of tickets, and their enforceability was not doubted. Technological advances should not upend established law that persons entering venues are bound by the terms and conditions of their tickets.

Plaintiffs are Philadelphia Eagles fans who traveled from New Jersey to Maryland to attend a National Football League ("NFL") game ("the Game") against the then-Washington Football Team ("WFT").[1] Plaintiffs allege that at the

---

[1] In February 2022, the Washington Football Team announced it was changing its team name to the "Washington Commanders." *See* Washington Commanders, *The Washington Football Team is now the Washington Commanders* (Feb. 2, 2022), *available at* https://www.commanders.com/news/the-washington-football-team-is-now-the-washington-commanders.

end of the Game they sustained injuries when they fell while leaning over a railing to "high five" the Eagles' quarterback and the railing gave way.

The cousin of one of the Plaintiffs, Brandon Gordon ("Gordon"), purchased electronic tickets to the Game that Plaintiffs used. Stadium personnel scanned each of Plaintiffs' electronic tickets from Gordon's phone, which allowed Plaintiffs to enter the venue and attend the Game. To download the tickets, Gordon had to, among other steps, click an electronic box acknowledging that he agreed to the WFT's terms and conditions (the "Ts&Cs") – he could not advance to the next page on the website to download the tickets without doing so. One provision in the Ts&Cs was a mandatory arbitration agreement requiring all disputes related to the ticket license or Game be brought in arbitration.

In violation of this arbitration agreement in their tickets, Plaintiffs filed suit against Defendants in federal court for their alleged injuries. Although Plaintiffs availed themselves of the rights provided by the ticket license and received the full and direct benefits of the license, Plaintiffs contend they are not bound by its terms. But that is not the law. The district court's denial of Defendants' Motion to Compel Arbitration and Dismiss the First Amended Complaint ("Motion") misapplies the law and disregards the emphatic federal policy to enforce arbitration agreements no differently than other contracts. That ruling, which this Court reviews *de novo*, should be reversed for three primary reasons.

First, the district court erroneously assessed the arbitrability of Plaintiffs' claims under Maryland law when it instead should have applied federal common law to determine whether Plaintiffs—nonsignatories to the Ts&Cs—are bound by the arbitration clause. This is a question of arbitrability (*i.e.*, scope of the arbitration clause) governed by federal substantive law, not contract formation governed by ordinary state law principles. *See Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 n.4 (4th Cir. 2000). In this case, there are two federal common laws addressing arbitrability that bind Plaintiffs to the mandatory arbitration clause: (1) the equitable estoppel "direct benefits" doctrine, and (2) federal agency law on apparent authority. Defendants are entitled to a presumption in favor of arbitrability under each. *See Washington Square Secs., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004).

Under federal common law, Plaintiffs are equitably estopped from repudiating the tickets' arbitration requirement because they intentionally availed themselves of the rights provided by their ticket licenses and received the full and direct benefits provided by those tickets. This is true regardless of whether a third party purchased the tickets for them or whether the tickets remained on that third party's phone. Plaintiffs used the tickets and received their full benefit, and so are subject to all the Ts&Cs—not just those that benefit them.

Second, although the Court need not decide whether Plaintiffs are bound through an agency relationship with Gordon because federal equitable estoppel is dispositive, the district court should have applied federal common law here too. The question of agency also goes to arbitrability. *See Int'l Paper Co.*, 206 F.3d at 417 n.4. Under federal common law, Gordon's assent to the arbitration clause based on his constructive notice is imputed to Plaintiffs because Plaintiffs' own conduct in accepting and using the tickets establishes Gordon's apparent authority to act as their agent.

Whether Gordon had constructive notice of the Ts&Cs *is* determined by state law as a matter of contract formation, and the district court erred here too by misapplying Maryland law on that question. It is undisputed that Gordon took multiple affirmative steps to acknowledge his assent to the Ts&Cs, including clicking buttons on two separate web pages that expressly acknowledged his agreement. These are the precise types of acts that courts applying Maryland law have found constitute constructive notice to manifest assent to online agreements. The district court, however, ignored this on-point authority, while also improperly relying on a state law rule on agency that is preempted by the FAA. The court's improper reliance on preempted state law is reversible error. *See Woodson v. Allstate Ins. Co.*, 855 F.3d 628, 630-61 (4th Cir. 2017) (reversing judgment when the district court should have held that state law claim was preempted by federal

law, and the district court did not address statute of limitations under governing federal law).

Third, Plaintiffs also are bound by the arbitration clause as third-party beneficiaries of the ticket licenses. The plain language of the Ts&Cs demonstrates that each Plaintiff, as an entrant to the stadium pursuant to the ticket license, was intended to be a primary party in interest. As third-party beneficiaries, Plaintiffs cannot accept the benefits of the tickets without also being bound by the obligations.

Under the district court's logic, millions of event goers who enter venues through electronic tickets purchased by someone else and/or held on someone else's phone would be unrestricted by the terms of those tickets (including policies pertaining to refunds, fan conduct, security, and health and safety).That simply cannot be the case. This Court should reverse the district court's refusal to enforce the mandatory arbitration requirement in Plaintiffs' ticket licenses.

## JURISDICTIONAL STATEMENT

Defendants Pro-Football, Inc. ("PFI") (the WFT legal entity), WFI Stadium Inc. ("WFI") (the stadium's legal entity), and Contemporary Services Corporation ("CSC") (which provided security services at the Game) moved the district court to compel arbitration of all claims and dismiss Plaintiffs' First Amended Complaint. JA56-74. On September 14, 2023, the district court denied that motion, requiring the action to proceed in federal court. JA238-239. On September 27, 2023,

Defendants timely filed a notice of appeal of the district court's order. JA290-291. This Court has jurisdiction over the appeal pursuant to Section 16 of the FAA, 9 U.S.C. § 16(a)(1)(C).

The district court had subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1332. There is diversity of citizenship between the parties, *see* JA57-58 (Am. Compl. ¶¶ 1-8), and Plaintiffs seek to recover amounts in excess of $75,000, exclusive of interest and costs. JA58 (Am. Compl. ¶ 10).

## STATEMENT OF THE ISSUES

1. Did the district court err by determining the arbitrability of Plaintiffs' claims according to Maryland rather than federal common law?

2. Did the district court err by failing to find Plaintiffs equitably estopped under federal law from repudiating the arbitration clause in their ticket license, when they intentionally availed themselves of the rights provided by their ticket license and received the full and direct benefits thereunder?

3. Did the district court err by applying a preempted state law rule to find that the person who purchased, downloaded, and displayed Plaintiffs' tickets at the stadium to allow them entry did not have apparent authority as Plaintiffs' agent to bind them to the tickets' terms?

4. Did the district court err by failing to find Plaintiffs bound by the arbitration clause as third-party beneficiaries of the ticket licenses?

## STATEMENT OF THE CASE

Plaintiffs traveled from New Jersey to Maryland to attend the January 2, 2022, NFL game between the Eagles and the WFT at FedExField in Landover, Maryland. JA59 (Am. Compl. ¶ 15). Plaintiffs entered the stadium and attended the Game through electronic tickets purchased by Gordon. JA59-60 (Am. Compl. ¶¶ 15-16, 21). Plaintiffs allege that at the conclusion of the Game they walked from their seats to the stadium tunnel and fell over a railing while reaching down to congratulate the Eagles' quarterback. JA62-63 (Am. Compl. ¶¶ 24 & 28).

In September 2022, Plaintiffs filed this lawsuit against PFI, WFI, and CSC seeking damages for their alleged injuries, JA12-14 (Compl. ¶¶ 15-26), in violation of the arbitration requirement in their ticket licenses.

## I. PLAINTIFFS' TICKET LICENSES INCLUDED A MANDATORY AGREEMENT TO ARBITRATE ALL CLAIMS RELATED TO THE TICKET OR GAME.

Each electronic ticket that Plaintiffs used to gain access to the stadium and attend the Game was a "revocable license[]" subject to binding Ts&Cs. *See* JA118 (copy of Ts&Cs included as Exhibit 1 to Declaration of Taylor Laurer in Support of Defs.' Mot.). Under the Ts&Cs, Plaintiffs are "Holders" of the ticket licenses, defined as the "**person seeking entry pursuant to such license**[.]" JA118 (emphasis in original). There is no dispute that Plaintiffs sought and gained entry to the stadium through use of the ticket licenses. *See* JA153-154 (Declaration of Plaintiff Michael A. Naimoli, Jr. in Support of Pls.' Opp'n to Defs.' Mot. ("Naimoli Decl.") ¶¶ 6-7). The Ts&Cs state that "**by purchase, acceptance and/or use of**

**such license, Holder is deemed to have read the Terms and has agreed to be bound by them**." JA118 (emphasis in original).

Among the binding Ts&Cs was a mandatory agreement for "Holders" and "Management" to arbitrate all claims related in any way to the ticket or Game: "**ANY DISPUTE, CLAIM, OR CAUSE OF ACTION IN ANY WAY RELATED TO THE TICKET OR THE EVENT SHALL BE RESOLVED BY MANDATORY, CONFIDENTIAL, FINAL, AND BINDING ARBITRATION.**" JA118 (emphasis in original). The clause expressly stated: "**THIS CLAUSE IS GOVERNED BY THE FEDERAL ARBITRATION ACT**" and that "**HOLDER UNDERSTANDS THAT THEY ARE WAIVING THEIR RIGHT TO A COURT OR JURY TRIAL.**" JA118 (emphasis in original). The Ts&Cs expressly warn Holders not to enter the stadium if they do not consent to the arbitration clause: "**IF HOLDER DOES NOT CONSENT TO THIS [ARBITRATION] CLAUSE, HOLDER MUST LEAVE OR NOT ENTER THE STADIUM.**" JA118 (emphasis in original). "Management" as defined in the Ts&Cs includes both PFI and WFI. *See* JA118.[2]

Besides the arbitration clause, Plaintiffs do not disclaim any other provision in the Ts&Cs, including for example, the policies addressing fan conduct, health and safety, confiscation of prohibited items, refunds, and most importantly, that the Ts&Cs permitted Holders like Plaintiffs to enter the stadium and attend the Game. *See* JA118 (Ts&Cs).

---

[2] Management is defined as the "National Football League ('NFL'), the Team and/or WFI Stadium, Inc." In turn, "Team" is defined as the "Washington Football Team," JA118, and PFI is the WFT legal entity.

## II.    PLAINTIFFS REPEATEDLY CHANGED THEIR STORY IN THE MIDDLE OF BRIEFING ABOUT THE PURCHASE AND USE OF THEIR TICKETS.

Plaintiffs have changed their allegations at least twice regarding how they obtained and used the ticket licenses to enter FedExField, requiring Defendants to respond each time to their new allegations. Plaintiffs' original Complaint alleged that "Plaintiffs paid for tickets" to the Game. JA12 (Compl. ¶ 15). Then, in response to Defendants' Motion to Compel Arbitration and Dismiss, JA31-33, Plaintiffs amended their Complaint to allege for the first time that their tickets were purchased for them by someone else, and that the tickets were purchased on a third-party website rather than the WFT's site: "Plaintiffs received the tickets for the game from [Plaintiff] Naimoli's cousin, who had in turn purchased the tickets from a website known as TickPick." JA59 (Am. Compl. ¶ 16). The Amended Complaint further alleged that "Naimoli's cousin, who did not attend the game himself, electronically forwarded the tickets to Plaintiffs." JA59-60 (Am. Compl. ¶¶ 18 & 20). This "cousin" was not identified by name. *See* JA59-60.

When Defendants renewed their motion to compel, JA94-120, Plaintiffs materially changed their story a second time – not through a further amended complaint but simply in their opposition brief. *See* JA121-154. Plaintiffs attached a declaration from Gordon, previously referred to as "Naimoli's cousin" in the Amended Complaint. *See* JA134-137 (Ex. A to Pls.' Opp'n ("Gordon Declaration")); *see also* JA59 (Am. Compl. ¶ 16). The Gordon Declaration again shifted Plaintiffs' account of how they obtained and used the tickets. First, the

Gordon Declaration averred that, contrary to the allegations in the Amended Complaint, Gordon in fact attended the Game with Plaintiffs. *Compare* JA59 (Am. Compl. ¶ 18), *with* JA135 (Gordon Decl. ¶ 2). Second, the Gordon Declaration averred, contrary to allegations in the Amended Complaint, that Plaintiffs did not have possession of the electronic tickets, but instead gained entry to FedExField when Gordon presented each of their tickets on his phone to stadium staff. *Compare* JA60 (Am. Compl. ¶ 21), *with* JA136-137 (Gordon Decl. ¶ 9).

## III. TO DOWNLOAD THE TICKETS USED BY PLAINTIFFS, GORDON REPEATEDLY HAD TO AGREE TO THE Ts&Cs.

Plaintiffs (now) claim that on December 27, 2021, Gordon purchased the electronic tickets on an online secondary marketplace known as "TickPick," JA136 (Gordon Decl. ¶ 5); that he subsequently received an email from Ticketmaster informing him that the electronic tickets were available to access on the Ticketmaster website, JA136 (Gordon Decl. ¶ 6); and that he next logged in to his Ticketmaster account, "accessed the electronic tickets[,]" and "placed [the electronic tickets] in [his] Apple Wallet on [his] iPhone." JA136 (Gordon Decl. ¶ 7). At the time, Ticketmaster was the official ticketing partner of the WFT and provided an online platform to access, download, and use electronic tickets. JA177-178 (Declaration of Matthew Carabajal in Support of Defs.' Reply in Support of Mot. ("Carabajal Decl.")).[3]

_____

[3] As explained by Mr. Carabajal, Senior Director of Ticket Operations for the Washington Commanders, TickPick is not integrated with Ticketmaster so

**A.    Gordon Agreed To The Ts&Cs When He Signed In To His Online Account And Advanced Past The Sign In Page.**

To access the electronic tickets, Gordon had to sign in to his Washington Football Account Manager.[4] On the Sign In Page, Gordon had to enter his email address and account password and then click a "Sign In" button before he could proceed further to access the electronic tickets.[5] JA179 (Carabajal Decl. ¶ 7); JA185 (Ex. 1 to Carabajal Decl. at p. 2 (screen capture of the "Sign In Page")). Directly above the "Sign In" button was a warning to the user that, "[b]y continuing past this page, you agree to the Terms of Use and understand that information will be used as described in the Ticketmaster Privacy Policy and the [WFT] Privacy Policy." JA185 (Sign In Page) (red color in original; underscore added to indicate the terms appearing in red). Below is a screen capture of the Sign In Page, with the warning to the user circled:[6]

_____

Washington Football tickets cannot be delivered to a buyer directly through TickPick. *See* JA178 (Carabajal Decl. ¶ 4).

[4] The Sign In Page was previously accessible at: https://am.ticketmaster.com/washington/. JA178 (Carabajal Decl. ¶ 5).

[5] This is referred to as a "sign-in wrapper agreement." *See infra* Argument Part IV.C.1.

[6] *See* JA178 (Carabajal Decl. ¶ 5 n.3) explaining that the screenshot of the Sign In Page included as part of Exhibit 1 to Mr. Carabajal's Declaration (and reprinted here) refers to the "Washington Commanders" instead of the WFT but is otherwise materially identical to the webpage that Gordon would have accessed. Plaintiffs do not dispute that the Sign In Page included as part of Exhibit 1 to Mr. Carabajal's Declaration is the same in all material respects as the Sign In Page in effect at the time of the Game, other than reference to the "Washington Commanders."



# Sign In to Washington Commanders

Powered by *ticketmaster*



(i) **Important Account Update**

You can now use the same email and password for both your Washington Commanders ticket account and your Ticketmaster account.

**Washington Commanders ticket holder?** Use your existing email to sign in and update your password if prompted.

**New here?** Use your Ticketmaster email and password.

**Learn More**

Email Address

Password

SHOW

☐ Remember Email                      **Forgot Password?**

By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in both the Ticketmaster **Privacy Policy** and **Washington Commanders Privacy Policy**.

New to Ticketmaster? **Sign Up**                      **Sign In**

Gordon continued past the Sign In Page to access the tickets, *see* JA179

(Carabajal Decl. ¶¶ 6-7), thereby evincing his agreement to the Terms of Use,

including the WFT's Ts&Cs. The Terms of Use and the privacy policies highlighted in red font on the Sign In Page provided hyperlinks that, if clicked, took the user to a separate page where the WFT's Ts&Cs (and also Ticketmaster's Terms of Use) were available to view. JA179 (Carabajal Decl. ¶ 7). Gordon had an opportunity to click on the "Terms of Use" hyperlink to read the Ts&Cs before he clicked the "Sign In" button to proceed past the Sign In Page. *See* JA179 (Carabajal Decl. ¶ 7). The WFT's Senior Director of Ticket Operations, based on his search of company records, confirms that Gordon twice signed in to his Washington Football Account Manager on January 2, 2022. JA179 (Carabajal Decl. ¶ 6).

### B. Gordon Agreed To The Ts&Cs A Second Time When He Clicked The "Agree" Button.

After Gordon signed in to his Washington Football Account Manager, but before he could access the electronic tickets, he was automatically redirected to a "pop-up" window webpage where he had another opportunity to view the Ts&Cs in full (as well as Ticketmaster's Terms of Use). JA179-180 (Carabajal Decl. ¶ 8). Gordon was required to affirmatively click an "Agree" button on this "pop-up" window to acknowledge that he agreed to the Ts&Cs. JA179-180 (Carabajal Decl. ¶ 8).[7] A screen capture of the pop-up page with the Ts&Cs and the "Agree" button circled appears below. JA186 (Carabajal Decl. Ex. 1 at p. 3 ("Pop-Up Window")).[8]

---

[7] This is referred to as a "clickwrap agreement." *See infra* Argument Part IV.C.2.

[8] *See* JA178 (Carabajal Decl. ¶ 5 n.3) explaining that this screenshot likewise refers to the "Washington Commanders" instead of the WFT but is otherwise the same in all material respects to the Pop-Up Window in effect at the time of the Game.

## Terms of Use

Ticketmaster    **Washington Commanders Terms & Conditions**

Tickets to Washington Commanders ("Team") games and other events held at FedExField are revocable licenses that only grant a one-time entry into the stadium or stadium grounds, as applicable, and, as applicable, a seat or event area or, if specified on the ticket, a standing location, for the specified game or event (the "Event") with no right of re-entry. **The person seeking entry pursuant to such license, and any accompanying minors or guests ("Holder"), agrees that such license is subject to these terms ("Terms") and by purchase, acceptance, and/or use of such license, Holder is deemed to have read the Terms and has agreed to be bound by them.** Failure to comply with the Terms shall result in forfeiture of the license and all rights arising under it without refund and entitle the Team, the National Football League ("NFL"), and/or, if applicable, WFI Stadium Inc. (individually or collectively, "Management") to pursue all legal remedies available. Admission may be refused or revoked and Holder may be ejected in Management's sole discretion.

**ALL TICKET SALES ARE FINAL. NO REFUNDS OR EXCHANGES EXCEPT AS PROVIDED HEREIN. THE SOLE AND EXCLUSIVE REMEDY** if admission is refused or revoked, stadium capacity limitations result in ticket cancellation, or the Event is canceled and not rescheduled for any reason, or for any breach of the Terms, is a refund of up to the ticket price set by Management ("Face Value"). **IN NO EVENT SHALL HOLDER BE ENTITLED TO ANY SPECIAL, CONSEQUENTIAL, INCIDENTAL, INDIRECT, OR EXEMPLARY DAMAGES OF ANY KIND INCLUDING, WITHOUT LIMITATION, ANY AMOUNT PAID IN EXCESS OF FACE VALUE FOR THE TICKET. ANY DISPUTE, CLAIM, OR CAUSE OF ACTION IN ANY WAY RELATED TO THE TICKET OR THE EVENT SHALL BE RESOLVED BY MANDATORY, CONFIDENTIAL, FINAL, AND BINDING ARBITRATION IN LANDOVER, MARYLAND. HOLDER AND MANAGEMENT AGREE THAT ALL DISPUTES SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS. HOLDER UNDERSTANDS, ACKNOWLEDGES, AND AGREES THAT HOLDER IS WAIVING HOLDER'S**



Disagree    Agree

---

Plaintiffs do not dispute that the Pop-Up Window Gordon accessed displayed an "Agree" button that the user was required to click before proceeding to the next page to access the electronic tickets. *See* JA263 (Ex. 3 to Pls.' Surreply, screenshot of how the Pop-Up Window appeared around the time the Surreply was filed, with the "Agree" button displayed in the screenshot).

Without clicking the "Agree" button on the Pop-Up Window, Gordon would not have been able to access the electronic tickets. JA179-180 (Carabajal Decl. ¶ 8); *see also* JA186 (Pop-Up Window). Plaintiffs do not claim that Gordon did not see the Pop-Up Window after signing in to his account. *See* JA275-276 (Memorandum Opinion); *Naimoli v. Pro-Football, Inc.*, No. TDC-22-2276, 2023 WL 5985256, --- F.Supp.3d ----, at *6 (D. Md. Sept. 14, 2023), *appeal filed* (4th Cir. Oct. 2, 2023). It is undisputed that Gordon clicked the "Agree" button regarding the Ts&Cs. JA179-180 (Gordon Decl. ¶ 8).

### C. Gordon Had Further Notice Of The Ts&Cs Through His Use Of The Electronic Tickets In His Apple Wallet.

Gordon downloaded the electronic tickets used by Plaintiffs to the Apple Wallet on his iPhone. *See* JA136 (Gordon Decl. ¶ 7). Each ticket in his Apple Wallet included the full Ts&Cs on the ticket's "back." JA180-181 (Carabajal Decl. ¶ 9).

### IV. PLAINTIFFS RECEIVED THE FULL AND DIRECT BENEFITS PROVIDED BY THE TICKET LICENSES.

Each Plaintiff entered the stadium and attended the Game when Gordon presented their tickets on his iPhone to stadium staff, who scanned each ticket to admit Plaintiffs. JA136 (Gordon Decl. ¶ 7); JA154 (Naimoli Decl. ¶¶ 6-7). Plaintiffs remained in the stadium for the entire Game. *See* JA60-62 (Am. Compl. ¶¶ 24, 28, 33).

# SUMMARY OF ARGUMENT

The arbitrability of Plaintiffs' claims is governed by the federal substantive law supporting the FAA, not the state law the district court erroneously applied. Two federal common laws bind Plaintiffs to their tickets' arbitration clause: (1) the federal equitable estoppel "direct benefits" doctrine, and (2) federal common law on agency based on apparent authority.

Plaintiffs are estopped under federal law from repudiating the tickets' mandatory arbitration clause when they intentionally availed themselves of the rights provided by their ticket licenses and received the full and direct benefits provided by the tickets. Plaintiffs also would be estopped under Maryland state law if that governed (which it does not) for the same reason. Plaintiffs are estopped under either law, thus ending the inquiry.

Although not necessary to reach, the district court also erred by applying state law to assess whether Gordon acted as Plaintiffs' agent to bind them to the arbitration clause. Under federal common law, Gordon's assent to the arbitration clause based on his constructive notice is imputed to Plaintiffs through his apparent authority to act for them.

Even had the district court appropriately looked to state law, it improperly relied on a judicially created Maryland rule on agency that is preempted by the FAA. The district court compounded its errors by also misapplying Maryland law

on constructive notice and ignoring directly on-point caselaw applying Maryland law in the context of online agreements.

Finally, Plaintiffs are bound by the arbitration clause as third-party beneficiaries of the ticket licenses. The plain language of the Ts&Cs demonstrates that each Plaintiff, by intentionally using the tickets to enter the stadium, was an intended primary party in interest of their ticket license.

## ARGUMENT

### STANDARD OF REVIEW

The district court's denial of Defendants' Motion is reviewed de novo. *See Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 178 (4th Cir. 2013). This includes reviewing "a district court's determination regarding the arbitrability of a dispute de novo," *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180, 185 (4th Cir. 2022) (citation omitted), and likewise reviewing de novo questions of contract formation governed by ordinary principles of state law, *see Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 699 (4th Cir. 2012).

When a party disputes that an arbitration agreement was formed, as Plaintiffs do, the Court must treat the motion to compel arbitration "akin" to a motion for summary judgment. *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015). If the party seeking to compel arbitration carries its evidentiary burden of showing the existence of an arbitration provision,

the party opposing arbitration "must make an unequivocal denial that an arbitration agreement exists — and must also show sufficient facts in support." *Id.* Under the summary judgment standard, a party cannot create a genuine dispute of material fact regarding the existence of a binding arbitration agreement through "mere speculation and conjecture." *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330–31 (4th Cir. 1998).

This Court reviews the "district court's decision regarding the admissibility of an affidavit [or other proffered evidence] for an abuse of discretion, and the factual determinations underlying the evidentiary ruling for clear error." *Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008).

Defendants have moved to dismiss this lawsuit pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(3), and/or (b)(6), and this Court has recognized that "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) (citation omitted).

## DISCUSSION

Four elements must be satisfied to compel arbitration pursuant to the FAA: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate

or foreign commerce, and (4) the failure, neglect or refusal of the [opposing party] to arbitrate the dispute." *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). As the district court acknowledged, "Plaintiffs do not dispute that the language of the arbitration clause would encompass the present dispute." JA270 (*Naimoli*, 2023 WL 5985256, at *4). Only the second element is at issue: the arbitrability of Plaintiffs' claims. *See* JA273 (*Naimoli*, 2023 WL 5985256, at *5) (district court stating that "there is no present dispute relating to the first, third, and fourth elements, and there is no dispute that the language of the arbitration clause covers the present dispute. . . . [T]he only issue in dispute is whether the arbitration clause was part of an agreement between the parties."). The district court erred in not holding Plaintiffs' claims arbitrable.

## I. THE ARBITRABILITY OF PLAINTIFFS' CLAIMS IS GOVERNED BY THE FEDERAL COMMON LAW SUPPORTING THE FAA.

The district court's order should be reversed because it applied the wrong governing law to determine whether Plaintiffs' claims are subject to the arbitration requirement in the tickets they used. The federal substantive law supporting the FAA – not state law – governs the arbitrability of claims by nonsignatories. *See Int'l Paper Co.*, 206 F.3d at 417 n.4 (enforceability of an arbitration clause against nonsignatories "presents no state law question of contract formation or validity, [so] we look to the federal substantive law of arbitrability to resolve this question.") (internal quotations omitted); *R.J. Griffin & Co. v. Beach Club II*

*Homeowners Ass'n*, 384 F.3d 157, 160 n.1 (4th Cir. 2004) (same). The district court committed reversible error when it applied Maryland law to this arbitrability question rather than federal common law. *See Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999) (reversing summary judgment where district court applied incorrect substantive law).

While in general "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *Int'l Paper*, 206 F.3d at 416 (quoting *United Steelworkers v. Warrior Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)), nonsignatories to a contract still may be "bound by, an arbitration provision within a contract executed by other parties." *Id.* at 416-17 ("a party [to a lawsuit] can agree to submit to arbitration by means other than personally signing a contract containing an arbitration clause" based on "[w]ell-established [federal] common law principles"). The Fourth Circuit recognizes that nonsignatories can be bound by an arbitration clause based on both the federal equitable estoppel "direct benefits" doctrine and federal common law principles of agency—these are questions of arbitrability and not contract formation. *See id.* at 416-17 (citing *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)). Nonsignatories who receive and accept the direct benefit of the contract will be equitably estopped from repudiating the other terms of the contract, including an arbitration clause. *R.J. Griffin*, 384 F.3d at 161.

Likewise, nonsignatories will be bound if the signatory to the contract had authority to act as their agent under federal common law. *See Int'l Paper*, 206 F.3d at 416-17.

In applying both federal common laws, Defendants are entitled to a presumption in favor of arbitration because the nonsignatory Plaintiffs are within the class of persons to whom the arbitration clause is directed. *See Washington Square Secs.*, 385 F.3d at 435 (applying presumption in favor of arbitration, finding the issue to be one of arbitrability and not contract formation when there was no dispute that nonsignatories qualified as "customers" within meaning of the contract (citing *Int'l Paper*, 206 F.3d at 416)).[9] Like *Washington Square*, there is no question that Plaintiffs fall within the class of persons ("Holders") to whom the arbitration clause in the tickets is directed. *See* JA118 (ticket "Holder" defined as any person "seeking entry [to the stadium] pursuant to such license[.]"). The district court's refusal to enforce the arbitration clause reflects the type of judicial hostility to arbitration agreements the U.S. Supreme Court has repeatedly warned against. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (FAA was enacted to curb "widespread judicial hostility to arbitration agreements").

---

[9] *Cf. UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 324 n.2 (4th Cir. 2013) (presumption of arbitrability not applied because there was a dispute regarding whether the nonsignatories qualified as "customers" under the contract, thereby raising a question of contract law).

## II. PLAINTIFFS ARE EQUITABLY ESTOPPED UNDER FEDERAL LAW FROM REPUDIATING THE ARBITRATION CLAUSE BECAUSE THEY RECEIVED THE FULL AND DIRECT BENEFITS OF THE TICKET LICENSE.

In the Fourth Circuit, "[a] nonsignatory is estopped from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." *R.J. Griffin*, 384 F.3d at 161 (alterations in original; quoting *Int'l Paper*, 206 F.3d at 418). A benefit is "direct" when it "flow[s] directly from the agreement." *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001).

This test is met here. There is no dispute that Plaintiffs directly received the benefit provided by the ticket licenses - attendance at the Game. *See* JA136-137 (Gordon Decl. ¶ 9); JA154 (Naimoli Decl. ¶¶ 6-7). It is also undisputed that the arbitration clause plainly applies to claims brought by persons entering the stadium. *See* JA118. The policy behind the equitable "direct benefits" doctrine is obvious: it would be fundamentally unfair to allow Plaintiffs to accept the direct benefits of the ticket licenses while simultaneously avoiding their obligations. Allowing such an easy circumvention of an arbitration agreement would contravene the emphatic federal policy of the FAA. *See Int'l Paper*, 206 F.3d at 418 ("To allow [a nonsignatory] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the

purposes underlying enactment of the [Federal] Arbitration Act.") (internal quotations omitted).[10]

This Fourth Circuit precedent is consistent with and supported by the Second Circuit's decision in *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999), which the Fourth Circuit cited when approving the "direct benefits" doctrine. *See Int'l Paper*, 206 F.3d at 418. In *Tencara*, the Second Circuit held nonsignatory purchasers of a yacht estopped from avoiding an arbitration clause in a contract between the shipyard building the yacht and a certifying organization that inspected the yacht, because the purchasers received direct benefits from that contract, including lower insurance rates and the ability to sail under the French flag based on the classification certificate. 170 F.3d at 353.[11]

---

[10] Plaintiffs have already received the direct benefits provided by the ticket licenses, whereas the nonsignatories in *International Paper* and *R.J. Griffin* were suing to receive the benefits of the contracts at issue. *See Int'l Paper*, 206 F.3d at 418; *R.J. Griffin*, 384 F.3d at 161. This difference is immaterial - the same fundamental policies of equity and giving effect to the FAA's purpose apply. *See Int'l Paper*, 206 F.3d at 418.

[11] *See also Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (nonsignatory to a trade name agreement that made use of the trade name was estopped from denying it was subject to the agreement's arbitration clause); *cf. E.I. DuPont de Nemours v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 200 (3d Cir. 2001) (declining to estop a nonsignatory from repudiating arbitration clause because there was "no evidence that [the nonsignatory] embraced the [contract containing the arbitration clause] during the lifetime of [that contract], or that [the nonsignatory] received any direct benefit under the [contract].").

As in *Tencara*, Plaintiffs here received the full and direct benefits provided by the ticket licenses. The central benefit, of course, was the right to enter FedExField and attend the Game. JA118-119 (the Ts&Cs). Plaintiffs would not have been granted access to the stadium except through use of the ticket licenses. JA115-116 (Laurer Decl. ¶ 3). Plaintiffs traveled 2.5 hours from New Jersey specifically to use the tickets. JA59 (Am. Compl. ¶ 15). Plaintiffs freely entered the stadium via the tickets presented on their behalf and stayed for the entire Game. JA154 (Naimoli Decl. ¶ 7); JA60-62 (Am. Compl. ¶¶ 24-28, 33). Plaintiffs cannot now deny they are bound by their tickets' arbitration clause simply because they used tickets purchased by someone else and/or held on someone else's phone. *See Int'l Paper*, 206 F.3d at 418 (it would be unfair for a party to "assert[] that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.").

## III. UNDER MARYLAND LAW, THE RESULTS ARE THE SAME – PLAINTIFFS ARE ESTOPPED FROM REPUDIATING THE ARBITRATION CLAUSE.

Even were the district court correct to apply state law (it was not), Plaintiffs still are estopped under Maryland law from repudiating their tickets' arbitration clause for the same reason as under federal law – they received and accepted the

direct benefits provided by their tickets.[12] Maryland state courts look to federal caselaw interpreting the FAA when deciding questions of arbitrability, including application of the equitable estoppel "direct benefits" doctrine. *See Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 368 (Md. 1994) (because the Maryland Uniform Arbitration Act is "the State analogue ... to the [FAA]" and "the same policy favoring enforcement of arbitration agreements is present in both our own and the federal acts[,]" Maryland courts "rely on decisions interpreting the Federal Arbitration Act") (internal citation and quotations omitted); *Griggs v. Evans*, 43 A.3d 1081, 1092 (Md. Ct. Spec. App. 2012) (applying equitable estoppel doctrine under Maryland law to bind nonsignatory to arbitration agreement, stating that "the doctrine of equitable estoppel is rooted in the equitable principle that it would be unfair for a party to 'rely on [a] contract when it works to its advantage, and

---

[12] The Supreme Court's decision in *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009), does not change the conclusion that federal law governs. In *Carlisle*, the Supreme Court stated that the FAA does not "purport[] to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." *Id.* at 630. A panel of this Court recently recognized that *Carlisle* "stands for the principle that if state contract law allows a person who was not a party to an arbitration agreement to nonetheless enforce it, then that nonparty is entitled to invoke the FAA's enforcement mechanisms in federal court." *Rogers v. Tug Hill Operating, LLC*, 76 F.4th 279, 287 (4th Cir. 2023), *petition for cert. filed* (Dec. 19, 2023) (citing *Carlisle*, 556 U.S. at 631–32). Here, the situation is reverse – it is the signatories to an arbitration agreement that seek to enforce it against nonsignatories who benefitted from the contract. *Carlisle*, as construed by the Fourth Circuit, does not govern. Regardless, this legal question is immaterial because Maryland's equitable estoppel doctrine yields the same result as federal common law equitable estoppel.

repudiate it when it works to its disadvantage.'") (alteration in original, quoting

*Wachovia Bank, Nat'l Ass'n v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006)). As

such, the arguments set forth in *supra* Argument Part II apply with equal force

under Maryland law.

## IV.   PLAINTIFFS ALSO ARE BOUND BY THE ARBITRATION CLAUSE UNDER FEDERAL COMMON LAW AGENCY PRINCIPLES.

The undisputed material facts establish that Gordon acted as Plaintiffs' agent

with apparent authority to bind them to the tickets' Ts&Cs. The district court erred

in finding no agency relationship. Should the Court reach this issue, it provides a

second independent ground for reversal.

The district court should have applied federal common law, not Maryland

law, in determining whether Gordon had apparent authority to bind Plaintiffs. *See*

*Int'l Paper*, 206 F.3d at 417 (recognizing "agency" as one of the enumerated

federal common laws that can bind nonsignatories to arbitration agreements).

Federal common law on agency follows the Restatement of Agency for guidance.

*Hodgin v. UTC Fire & Sec. Americas Corp.*, 885 F.3d 243, 252 (4th Cir. 2018)

(looking to Restatement (Third) of Agency to determine federal common law on

agency principles) (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730,

752 (1989)). Here, Gordon had apparent authority to bind Plaintiffs as their agent

and his assent to the arbitration clause based on his constructive notice is imputed

to Plaintiffs. *See* Restatement (Third) of Agency § 5.03 (2006) ("[N]otice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal.").

### A. Federal Common Law Determines Gordon's Apparent Authority To Bind Plaintiffs.

The district court should have applied federal common law on apparent authority to determine whether Plaintiffs and Gordon had an agency relationship, *see Int'l Paper*, 206 F.3d at 417, which "holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Restatement (Third) of Agency § 2.03(c) (2006). An agency relationship exists under federal common law even if the agent fails to notify the principal of the information it knows. *See* Restatement (Third) of Agency § 5.03 cmt. b (2006) ("A principal may not rebut the imputation of an agent's notice of a fact by establishing that the agent kept silent."). Thus, even if Gordon never informed Plaintiffs about the arbitration clause, Gordon's constructive notice is still imputed to Plaintiffs as their agent. There is robust on-point caselaw involving cruise ship passengers, in which courts have imputed notice of a ticket's terms to the passengers whose tickets were purchased for them by someone else, even when the passengers never

possessed or read their tickets before boarding.[13] The district court wrongly disregarded these cruise ship decisions, in part because they involve forum selection clauses and limitations provisions rather than arbitration clauses. *See* JA285 (*Naimoli*, 2023 WL 5985256, at \*10). But the principle of holding nonsignatories to a ticket's terms, even if they did not read the terms or ever physically possess the ticket, is the same. Fans entering a football game are no less charged with knowledge of their tickets' terms and conditions than passengers boarding a cruise ship. In any case, the district court failed to recognize that an arbitration clause *is* a type of forum selection clause. *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012) (citing *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519 (1974)).

Industry custom "defines the context in which a third party assesses the fit between the position in which the principal has placed an agent and the particular

---

[13] *See Gomez v. Royal Caribbean Cruise Lines*, 964 F. Supp. 47, 50-51 (D.P.R. 1997) ("[N]otice of important conditions of a passage contract can be imputed to a passenger who has not personally received the ticket or possession thereof.") (enforcing tickets' forum selection clause); *Kientzler v. Sun Line Greece Shipping Co.*, 779 F. Supp. 342, 346 (S.D.N.Y. 1991) ("[E]ven if another person acting as Plaintiff's agent handled her ticket exclusively, Plaintiff is still charged with knowledge of its contents."); *Ciliberto v. Carnival Cruise Lines, Inc.*, No. 85–4017, 1986 WL 2560, at \*3 (E.D. Pa. Feb. 25, 1986) (charging passenger with knowledge of contents of ticket when the "plaintiff delegate[d] the responsibility for acquiring and holding their tickets" to a traveling companion); *DeCarlo v. Italian Line*, 416 F. Supp. 1136, 1137 (S.D.N.Y. 1976) (charging plaintiff with notice of limitation provision even though she did not have possession of ticket because her friend acted as agent in purchasing and holding ticket for the plaintiff).

act." Restatement (Third) of Agency § 2.03. It is an industry custom that tickets used to enter stadiums and other entertainment venues are now typically stored on cell phones, including on the phone of another in an attendee's party who may have purchased the tickets and held them for the attendee. This common, even routine practice must be accounted for.[14]

In very similar circumstances, a federal district court recently held an event attendee bound by an electronic ticket's arbitration clause even though the tickets were purchased by another and remained on the purchaser's phone. *See Jackson v. World Wrestling Entm't, Inc.*, No. 4:23-CV-0172-P, 2023 WL 3326115, at *3 (N.D. Tex. May 9, 2023), *appeal filed* (5th Cir. May 11, 2023). Similar to the facts here, "the purchaser was required to check two boxes on the SeatGeek website," with one providing that "[b]y checking this box, you are agreeing to AT&T

---

[14] The district court found that it was "not even clear that plaintiffs were the intended users of the tickets at the time of the purchase" by Gordon, JA282 (*Naimoli*, 2023 WL 5985256, at *9), and this showed that Gordon did not have actual authority to bind Plaintiffs to the Ts&Cs. Defendants are not arguing that Gordon had actual authority to bind Plaintiffs by virtue of his purchasing the tickets. Nor would it even matter if Gordon purchased the tickets without Plaintiffs specifically in mind at the exact time of purchase. What matters is that Plaintiffs accepted and used the tickets to attend the Game – they intentionally availed themselves of the rights provided by their ticket licenses; received the full and direct benefits provided by those tickets; and took affirmative steps (including entering the stadium via the ticket licenses on Gordon's phone), creating the reasonable belief by Defendants that Gordon had apparent authority to bind Plaintiffs to all the tickets' terms and conditions.

Stadium's terms and conditions." The *Jackson* court imputed these acts of knowledge and assent by the ticket purchaser to the event attendee:

> The issue before the Court is simple and straightforward. There is no dispute that WWE is one of the 'Released Parties' under the terms of Arbitration Agreement. It [is] also undisputed that [the agent], not [the principal], purchased the WrestleMania electronic mobile ticket and it was [the agent] that accepted the multiple acknowledgments of the Arbitration Agreement through Seatgeek.com and/or the SeatGeek app or the Dallas Cowboys App. Further, [it] is undisputed that [the agent] stored the tickets on his cellphone and presented the tickets at upon entering AT&T Stadium to attend WrestleMania with [the principal]. Moreover, there is no dispute over whether [the principal] ever held or accessed his ticket or reviewed the Arbitration Agreement. The Court presumes he did not. . . .

*Id.*, at *3. Nearly identical facts are also undisputed in this case.

The *Jackson* court found an agency relationship "[b]ased on long-standing and highly analogous law," particularly the "plethora of decisions involving cruise ship tickets containing binding arbitration provisions where an injured passenger seeks to avoid arbitration by arguing that another passenger purchased or held the ticket." 2023 WL 3326115, at *3-4. These are many of the same cases Defendants cited to the district court. *See* JA104-105; JA172-174. Like the cruise ship cases, the *Jackson* court reasoned that "an attendee of an event who takes advantage of the ticket but chooses to forego the opportunity to review the terms of the ticket by leaving it in the hands of his agent is charged with knowledge of its terms." *Id.*, at *4. And like the Fourth Circuit's concern in *International Paper* about nonsignatories circumventing arbitration agreements, 206 F.3d at 418, the *Jackson*

court stated, "[h]olding otherwise would permit those who use tickets purchased by others to thwart a clearly provided for, accepted, and acknowledged Arbitration Agreement." 2023 WL 3326115, at *4.

Plaintiffs here should similarly be charged with notice of the ticket licenses' arbitration clause to avoid thwarting a clear arbitration agreement and creating an enormous loophole that ignores the industry custom of buying and scanning electronic tickets on behalf of others. *See* Restatement (Third) of Agency § 5.03 ("[A] principal may not choose to act through agents whom it has clothed with the trappings of authority and then determine at a later time whether the consequences of their acts offer an advantage.").

### B. The District Court Erred By Relying On A Judicially Created State Rule That Is Preempted By The FAA.

The U.S. Supreme Court has repeatedly affirmed that because the "national policy" of the FAA is to override historic hostility to arbitration clauses, the FAA preempts "state law" that does not "place[] arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Section 2 of the FAA, commonly referred to as the statute's "savings clause," permits "agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an

agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339 (holding a

judicially created California rule preempted by the FAA) (quoting 9 U.S.C. § 2).

The district court refused to compel arbitration because it held, as a matter of

law, that any notice to Gordon of the Ts&Cs was not imputed to Plaintiffs. Critical

to the court's ruling was its reliance on a judicially created state rule that would

have required Plaintiffs to be "aware" of the arbitration clause for Gordon to have

apparent authority to bind them. *See* JA279-287 (*Naimoli*, 2023 WL 5985256, at

*8-10 (relying on *Dickerson* and *Rankin*)).[15] But the "awareness" requirement

adopted in *Dickerson* (and followed in *Rankin*) is preempted by the FAA because it

violates that statute's "equal-treatment principle" guaranteed to arbitration

agreements. *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 581 U.S. 246, 254-55

(2017).[16]

---

[15] *Dickerson*, 995 A.2d 721; *Rankin v. Brinton Woods of Frankford, LLC*, 211 A.3d 645 (Md. Ct. Spec. App. 2019). Neither of these decisions involved arbitration agreements governed by the FAA.

[16] Defendants did not have an opportunity to brief the district court about the preemption of Maryland's "awareness" rule in *Dickerson* and *Rankin* because Plaintiffs did not make arguments based on those cases until the filing of their Surreply to the Motion to Compel Arbitration. JA218-220. Defendants opposed Plaintiffs' Motion for Leave to File their Surreply on procedural grounds, noting that the arguments in Defendants' reply brief were in direct response to the material changes in Plaintiffs' allegations and thus did not give Plaintiffs a right to a surreply. *See* JA232-237; *Marshall v. Cap. View Mut. Homes*, No. CIV. RWT-12-3109, 2013 WL 3353752, at *2–3 (D. Md. July 2, 2013) (when "the arguments made by [a party] in their reply brief are merely responses to new arguments made by [a party] in their response, a sur-reply is not appropriate."); *EEOC v. Freeman*,

Maryland's "awareness" requirement from *Dickerson* uniquely imposes an additional burden on arbitration agreements that Maryland courts do not apply to other types of contracts.[17] The district court even acknowledged that *Dickerson*'s apparent authority "awareness" rule treats arbitration agreements differently. *See* JA280 (*Naimoli*, 2023 WL 5985256, at *8 ("Maryland courts have required ***more*** than the establishment or appearance of a general principal-agent relationship and instead have drawn distinctions based on the types of decisions that the principal appeared to authorize the agent to undertake, and they ***have specifically distinguished the decision whether to enter into an arbitration agreement*** as part of a broader contractual relationship as requiring at least knowledge of its existence." (emphasis added))). As such, this "awareness" requirement just for arbitration agreements discriminates against such agreements in violation of the FAA.

This preempted state law rule was critical to the district court's holding that Gordon did not act with apparent authority under Maryland law:

> ***There is no claim or evidence that Plaintiffs were aware of the arbitration clause,*** or even the WFT Terms & Conditions more generally, so the Court

961 F. Supp. 2d 783, 801 (D. Md. 2013) (denying motion for leave to file surreply), *aff'd in part sub nom., EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015). However, the district court accepted Plaintiffs' Surreply, JA238-239 (granting in part Motion for Leave to File Surreply), less than ten minutes before the court denied Defendants' Motion to Compel Arbitration, JA288-289.

[17] *See Williams v. Dimensions Health Corp.*, 279 A.3d 954, 958, 961 n.9 (Md. 2022) (following the Restatement (Third) of Agency § 2.03 ("Apparent Authority"), which does not have an "awareness" requirement).

cannot find that Gordon had apparent authority to enter into a contract containing an arbitration clause, or that Plaintiffs later ratified or assented to the contract and its arbitration clause.

JA284 (*Naimoli*, 2023 WL 5985256, at *9 (emphasis added (citing *Rankin*, 211 A.3d at 651, 654-55))). The *Dickerson* and *Rankin* decisions relied on by the district court are squarely at odds with the U.S. Supreme Court's decision in *Kindred*, 581 U.S. at 248, which preempted a judicially created state rule by the Kentucky Supreme Court that was substantially similar to the one in *Dickerson*.[18] Because Maryland's "awareness" requirement, like the rule in *Kindred*, does not place arbitration agreements on equal footing with other types of contracts and therefore violates the FAA's equal-treatment principle, the district court's reliance on that preempted rule is reversible error. *See Woodson*, 855 F.3d at 630-61.

---

[18] In *Dickerson*, the Supreme Court of Maryland found no apparent authority when the purported agent represented to a nursing home that he was the "legal representative," "legal guardian," and had "durable power of attorney for health care/resident advocacy" for a resident, but the power of attorney agreement did not expressly authorize him to enter into arbitration agreements, and there was no evidence that the principal was "ever aware of the arbitration agreement that [the agent] signed." 995 A.2d at 727, 740. The U.S. Supreme Court in *Kindred*, decided seven years after *Dickerson*, made clear that requiring such an explicit statement as applied to an arbitration agreement, much less a principal's awareness of such clause, is "subjecting [arbitration agreements], by virtue of their defining trait, to uncommon barriers," 581 U.S. at 252, thus violating the FAA's "equal-treatment principle" guaranteed to arbitration agreements. *See id.* at 254-55.

### C.    The Undisputed Material Facts Show That Gordon Had Constructive Notice Of The Arbitration Agreement.

Whether Gordon had, at a minimum, constructive notice of the arbitration agreement in the Ts&Cs (which can then be imputed) is a matter of contract formation and therefore determined by ordinary principles of Maryland law. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Maryland law, a contract is formed with "mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration." *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F. 3d 114, 123 (4th Cir. 2004) (Maryland law). Plaintiffs do not dispute the last two of these elements; Plaintiffs only argue that Gordon did not have constructive notice of the Ts&Cs to manifest his assent. JA127-128. They are wrong, and the district court was wrong to find a genuine issue of material fact on this question. Under a proper application of Maryland law, the undisputed material evidence shows at least three different ways that Gordon had constructive notice.

### 1.    Sign In Page

Plaintiffs do not dispute that Gordon clicked the "Sign In" button on the Sign In Page after entering his account information; that directly below the "Sign In" button was a warning stating that, "[b]y continuing past this page, you agree to

the Terms of Use"; or that if clicked, the hyperlink in red would have taken Gordon to the Ts&Cs. JA179 (Carabajal Decl. ¶¶ 6-7).[19]

Although Gordon claims that the Ts&Cs were not displayed on the Sign In Page that he accessed, and that he did not click on the hyperlink, JA136 (Gordon Decl. ¶ 6), that is not material to constructive notice under Maryland law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("substantive law" identifies "which facts are material"). Under Maryland law, a party is presumed to have read and understood a contract's terms and will be bound when he has taken the steps to enter into an agreement. *See, e.g.*, *Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 556 (Md. 2006) (affirming motion to compel arbitration, stating that a party who enters into a contract is presumed to have read and understood its terms); *Randolph v. RRR Bowie, LLC*, No. 22-CV-2150-PX, 2023 WL 7110516, at *5 (D. Md. Oct. 27, 2023) (applying same presumption to arbitration agreement). The district court ignored this presumption and instead relied on caselaw from other jurisdictions applying other states' laws that impose higher and different burdens than Maryland law on establishing constructive notice of online

---

[19] This is referred to as a "sign-in wrap" agreement, where "the user has access to the terms and conditions via a hyperlink, the user does not have to read the terms and conditions before signing up." *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 696 n.8 (E.D. Va. 2020). The district court referred to the Sign In Page as containing a "browsewrap agreement," JA274-275 (*Naimoli*, 2023 WL 5985256, at *6), which for purposes of this brief is used interchangeably with "sign-in wrap" agreement.

agreements. *See* JA274-275 (*Naimoli*, 2023 WL 5985256, at *6 (citing Ninth

Circuit decisions applying California and Washington law on constructive notice

of online agreements)).[20]

The district court also failed to discuss the most relevant decision applying

Maryland law to notice of an arbitration clause in an online agreement, *Lyles v.*

*Chegg, Inc.*, No. RDB-19-3235, 2020 WL 1985043 (D. Md. Apr. 27, 2020), even

though Defendants brought that case to the court's attention in their Reply Brief.

*See* JA168-169. The layout of the sign-in website that the *Lyles* court found

---

[20] While the district court relied on cases applying state laws inconsistent with
Maryland law, there is substantial out-of-state authority consistent with Maryland
law on constructive notice of arbitration and other types of forum selection clauses
in online agreements. *See, e.g.*, *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir.
2021) (upholding sign-in wrap agreement with hyperlinked access to terms and
conditions that stated in red color, as in the present case, "By signing up, I agree to
Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host
Guarantee Terms"); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75-76 (2d Cir. 2017)
(Uber's online agreement containing a hyperlink to the terms and conditions
provided notice of the contract terms, including an arbitration clause, when it
included a warning on the account registration page stating, "[b]y creating an Uber
account, you agree to the TERMS OF SERVICE & PRIVACY POLICY[,]"). It
also matters that the hyperlink to the Ts&Cs here was directly below the "Sign In"
button. *See Crawford v. Beachbody, LLC*, No. 14-cv-1583-GPC (KSC), 2014 WL
6606563, at *3 (S.D. Cal. Nov. 5, 2014) (forum selection clause binding where
consumer clicked on "Place Order" button, above which was statement informing
user that by clicking the button the user was subject to the website's "Terms and
Conditions" available via hyperlink); *Starke v. Gilt Groupe, Inc.*, No. 13 Civ.
5497(LLS), 2014 WL 1652225, at *1–3 (S.D.N.Y. Apr. 24, 2014) (arbitration
clause in "terms of use" binding where consumer clicked "Shop Now" button next
to statement that informed consumer, "the consumer . . . agrees to be bound by the
'Terms of Membership,'" which were available next to the button as a hyperlink).

reasonably communicated the Terms of Use is materially identical to the layout of the Sign In Page here, which similarly presented a button inviting users to "Sign up" by providing an email address and creating a password. 2020 WL 1985043, at *4. Below the "Sign up" button was a warning, essentially the same as the Sign In Page here, that "By clicking 'sign up' you agree to the Terms and Privacy Policy." *Id.*

The only difference is that the user in *Lyles* could access the Terms of Use by hovering his cursor over the word "Terms" rather than having to click a hyperlink. *Lyles*, 2020 WL 1985043, at *4. But that difference is immaterial – the critical fact in *Lyles* was that the plaintiff had the ***opportunity*** to review those terms before signing in to his account. *See id.* (finding the website "clearly indicated that, by signing up for a Chegg account, a user agreed to those terms"). The facts here are materially the same – the Sign In Page reasonably communicated that Gordon would agree to the Ts&Cs by signing in to his account, and he had ample opportunity to review the Ts&Cs before he signed in.

### 2. Pop-Up Window Page

Gordon yet again manifested assent to the Ts&Cs a second time by affirmatively clicking the "Agree" button to those terms – after being directed to review them - on the "Pop-Up Window" page; this step was required to access the tickets. *See* JA179-180 (Carabajal Decl. ¶ 8). The Maryland district court's

decision in *Fusha v. Delta Airlines, Inc.*, No. RDB-10-2571, 2011 WL 3849657, at *3 (D. Md. Aug. 30, 2011), confirms that Gordon's affirmative click of the "Agree" button on the Pop-Up Window page effectively conveyed his agreement to the arbitration clause in the Ts&Cs, whether or not he read those terms. The *Fusha* court enforced a forum selection clause in an online agreement where the plaintiff similarly clicked an "I accept" box acknowledging that she read the Terms & Conditions, which allowed her to proceed to the next page to purchase her tickets. *Id.* The court enforced the forum selection clause even though the plaintiff later stated that she "ha[d] no recollection of ever reading, much less agreeing to, a forum selection clause[.]" *Id.*, at *2. This is so, because under Maryland law, the "failure to read an enforceable online agreement, as with any binding contract, will not excuse compliance with its terms." *Id.*, at *3; *see also LTVN Holdings LLC v. Odeh*, No. CCB-09-0789, 2009 WL 3736526, at *4 (D. Md. Nov. 5, 2009) (forum selection clause enforceable "whether or not [Defendant] read all the agreement's terms."). As in *Fusha*, regardless of whether Gordon read the Ts&Cs on the Pop-Up Window page before clicking the "Agree" button, he is still bound by the terms because he had the opportunity to read them before clicking "Agree."

The district court noted that on the Pop-Up Window page, Ticketmaster's Terms of Use were displayed in the first "tab" and the WFT's Ts&Cs were displayed in the second "tab" on the ***same webpage***—this was part of the court's

basis for finding a genuine issue of material fact. *See* JA276 (*Naimoli*, 2023 WL 5985256, at \*6). This issue is not material. Regardless of whether Ticketmaster's Terms of Use were displayed in the first tab, the undisputed evidence establishes that Gordon was required to, and in fact did, click the "Agree" button on the Pop-Up Window *as to* **WFT's Ts&Cs** and not only Ticketmaster's Terms of Use, and that he had the opportunity to review those terms before affirmatively clicking the "Agree" button. JA179-180 (Carabajal Decl. ¶ 8). Nothing more than the opportunity is needed under Maryland law, and Gordon is legally presumed to have read and agreed to the Ts&Cs. *See Fusha*, 2011 WL 3849657, at \*3.

The district court compounded its misapplication of Maryland law on notice by improperly relying on unauthenticated evidence proffered by Plaintiffs to find a genuine issue of fact regarding Gordon's notice of the Ts&Cs through the Pop-Up Window. The district court's opinion cites Exhibits 2 and 3 to Plaintiffs' Surreply, JA260-263, which Plaintiffs contend are screenshots depicting how the Pop-Up Window appeared recently. *See* JA276-277 (*Naimoli*, 2023 WL 5985256, at \*6-7). But the court never should have considered this evidence because those exhibits were not authenticated—they were only introduced through attorney argument in Plaintiffs' legal brief. *See* JA246-247 (Surreply at 7-8). Unsworn attorney statements or arguments are not competent summary judgment evidence. *See*, *e.g.*, *Rountree v. Fairfax Cty. Sch. Bd.*, 933 F.2d 219, 223 (4th Cir. 1991). The court's

consideration of this unauthenticated evidence was an abuse of its discretion.[21] *See Giles v. Nat'l R.R. Passenger Corp.*, 59 F. 4th 696, 704 (4th Cir. 2023) ("Courts in the Fourth Circuit may not consider inadmissible evidence on a motion for summary judgment.").[22]

### 3. Apple Wallet

Gordon on yet a third occasion again manifested assent to the Ts&Cs by downloading each of the tickets used by Plaintiffs to the Apple Wallet on his iPhone. *See* JA136-137 (Gordon Decl. ¶¶ 7-9). Each electronic ticket had a "front" and a "back." JA180-181 (Carabajal Decl. ¶ 9). In the top right corner of the "front" of the electronic ticket in the Apple Wallet application, three clickable dots appeared that directed the user to the "back" of the ticket. JA180-181 (Carabajal Decl. ¶ 9). On the "back" appeared the Ts&Cs in full. JA180-181 (Carabajal Decl. ¶ 9). Gordon had the opportunity to review the Ts&Cs on any of the tickets stored

---

[21] *See Meyers v. Lamer*, 743 F.3d 908, 915 (4th Cir. 2014) ("We review the trial court's decision regarding whether to admit evidence into the summary judgment record for an abuse of discretion.").

[22] According to the district court, the screen capture of the Pop-Up Window page purportedly depicted in Exhibit 3 to Plaintiffs' Surreply shows that if "a user clicks 'Agree' as to the Ticketmaster Terms of Use, the pop-up window disappears, and the user can proceed without ever viewing the WFT Terms & Conditions." JA276 (*Naimoli*, 2023 WL 5985256, at *6 (citing JA244-245)). The district court should not have based its findings on that unauthenticated screen capture. In any case, even this exhibit makes clear that WFT's Ts&Cs were available to view on the Pop-Up Window before Gordon clicked the "Agree" button to proceed to the next page where he was then able to access the tickets. Again, nothing more is needed.

in his Apple Wallet at any time prior to entering the Game. *See Jackson*, 2023 WL 3326115 (relying in part on action of storing electronic tickets to iPhone in finding that agent had constructive notice of the arbitration agreement).

*    *    *    *    *

In these ways, and on no less than three separate occasions, Gordon had at least constructive notice of the arbitration clause and an opportunity to review it, consistent with Maryland law; the district court erred in finding a genuine issue of material fact. The district court further erred by then not imputing Gordon's notice of the Ts&Cs to the Plaintiffs through an agency relationship based on apparent authority under federal common law.

## V.    PLAINTIFFS ARE BOUND BY THE ARBITRATION CLAUSE AS THIRD-PARTY BENEFICIARIES OF THE TICKET LICENSES.

Plaintiffs also are bound by the Ts&Cs as third-party beneficiaries to the ticket licenses under Maryland contract law. *See R.J. Griffin*, 384 F.3d at 164 n.2 (applying state law to determine whether nonsignatory to contract containing arbitration clause was bound as a third-party beneficiary "because this issue presents a question of the parties' intentions during contract formation").

Under Maryland law, a third-party beneficiary to a contract may be bound by the contract's arbitration clause. *See Dist. Moving & Storage Co. v. Gardiner & Gardiner, Inc.*, 492 A.2d 319, 323 (Md. Ct. Spec. App. 1985) ("[W]here a third party beneficiary attempts to sue a promiser, that promisor may apply the contract

provisions against the third party beneficiary in the same manner available against the original promisee."), *aff'd sub nom.*, *Dist. Moving & Storage, Inc. v. Fedco Sys., Inc.*, 508 A.2d 487 (Md. 1986) (affirming ruling that lessee, as third party beneficiary of architect and construction contracts, was bound by the contracts' arbitration clauses). A third-party beneficiary attains not only the benefits that come with a contract but also its obligations. *See Coll. of Notre Dame of Md., Inc. v. Morabito Consultants, Inc.*, 752 A.2d 265, 276 (Md. Ct. Spec. App. 2000) ("Both the promisee and the beneficiary may enforce the contract, with the third party beneficiary bound by the contract provisions." (internal citation omitted)).

When interpreting contracts, including ascertaining the intent of the parties, "Maryland follows the objective standard of contract interpretation, which requires that 'where the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court.'" *Griggs*, 43 A.3d at 1087 (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620 (Md. 2001)). An individual is a third-party beneficiary to a contract if 'the contract was intended for his [or her] benefit' and 'it . . . clearly appear[s] that the parties intended to recognize him [or her] as the primary party in interest and as privy to the promise.'" *120 W. Fayette St., LLLP v. Mayor of Balt.*, 43 A.3d 355, 368 (Md. 2012) (alterations in original, quoting *Dickerson*, 995 A.2d at 741).

The plain language of the Ts&Cs unequivocally establishes that Plaintiffs were intended to be third-party beneficiaries because they are a primary party in interest. They are the persons who received the tickets' principal benefit - to provide "Holders" entry to the stadium and the Game. Plaintiffs, who are indisputably "Holders," used the ticket licenses for that exact purpose. *See Lovell Land, Inc. v. State Highway Admin.*, 969 A.2d 284, 287-89 (Md. 2009) (recognizing that it is relevant whether the third party is referred to in the agreement or would fall within the meaning of a defined party in that agreement). Plaintiffs, as primary beneficiaries, are bound by all of the ticket licenses' Ts&Cs, including the arbitration clause. *See R.J. Griffin*, 384 F.3d at 164 n.2.

## VI.    ALTERNATIVELY, THE COURT SHOULD REVERSE THE DISTRICT COURT'S ORDER AND REMAND WITH INSTRUCTION FOR LIMITED DISCOVERY.

Although the question of arbitrability can be resolved on the law and the undisputed material facts, if the Court determines otherwise, Defendants respectfully request that the Court reverse the district court's order in its entirety; remand the case for discovery limited to any factual dispute regarding arbitrability; and upon completing that limited discovery, order the district court to reconsider the arbitrability of Plaintiffs' claims through renewed motions practice. *See Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 713 (4th Cir. 2015) (remanding to district court and stating that if a party's motion to compel arbitration pursuant to the FAA presents unresolved questions of material fact, the FAA "'call[s] for an

expeditious and summary hearing' to resolve those questions.") (alteration in original, quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)); *see also* 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.").

## VII. CSC HAD STANDING TO JOIN IN THE MOTION.

CSC had standing to join in the Motion because the factual allegations and causes of action directed against CSC are inextricably intertwined with those against PFI and WFI. *See Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001) (plaintiffs' claims against nonsignatory defendant shareholders were arbitrable when those claims were intertwined with claims against the signatory corporation); *Williamsport Realty, LLC v. LKQ Penn-Mar, Inc.*, No. 3:14-CV-118, 2015 WL 2354598, at *6 (N.D. W. Va. May 15, 2015) ("Fourth Circuit has granted the requests of nonsignatory defendants to arbitrate claims that would not otherwise be arbitrable when those claims were sufficiently intertwined with arbitrable claims against signatory co-defendants." (citing *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315 (4th Cir.1988))). The Amended Complaint alleges that the signatories to the Ts&Cs (PFI and WFI, as part of "Management" defined in the Ts&Cs, *see* JA118) engaged in coordinated behavior with a nonsignatory (CSC) against Plaintiffs' interests, with the Amended Complaint repeatedly alleging that "Defendants" collectively were responsible for actions and harm

rather than isolating any single Defendant.[23] If the claims against CSC were litigated in federal court, but the claims against PFI and WFI were subject to arbitration, such parallel proceedings would be judicially inefficient, risk inconsistent rulings, and lead to the inability to reach a full and complete result in the arbitration proceeding.

## CONCLUSION

For the reasons set forth herein, this Court should hold Plaintiffs to the terms of the ticket licenses they used to attend the Game. Defendants respectfully request that this Court reverse the district court's order denying their Motion to Compel Arbitration and Dismiss the First Amended Complaint, and order all of Plaintiffs' claims in this lawsuit to mandatory, binding arbitration. This Court should further dismiss this lawsuit pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(3), and/or (b)(6), as all of Plaintiffs' claims are subject to mandatory arbitration. Alternatively, the Court should reverse the district court's ruling and remand for limited discovery regarding arbitrability.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Local Rule 34(a), Defendants respectfully submit that oral argument would assist the Court in consideration of the important legal question

---

[23] *See, e.g.*, JA61 (Am. Compl. ¶ 27-29) (alleging "CSC employees/agent guided the Plaintiffs" to the railing where they fell over, that "[t]his was an area **known by all Defendants** to be a regular gathering location for football fans following a football game[,]" and that "***[a]ll of the Defendants knew***, or should have known, that extreme pressure . . . would be placed on the railings between where the fans, including the Plaintiffs, were located and the tunnel below" (emphasis added)); *see also* JA61-62, JA65, JA71 (Am. Compl. ¶¶ 31, 33, 36, 54, 86-87).

that this Court has not yet addressed: whether fans entering a stadium pursuant to an electronic ticket on another person's phone can disavow the terms of that ticket and bypass a mandatory arbitration clause. Not only does this raise important federal policies enshrined in the FAA, but it also carries a potentially significant practical impact on the daily use of electronic tickets by millions of persons entering venues across the country.

DATE: December 28, 2023

Respectfully submitted,

*/s/ Joe G. Hollingsworth*

Joe G. Hollingsworth
jhollingsworth@hollingsworthllp.com
Grant W. Hollingsworth
ghollingsworth@hollingsworthllp.com
Brett S. Covington
bcovington@hollingsworthllp.com
Hollingsworth LLP
1350 I Street, N.W.
Washington, DC 20005
T: (202) 898-5800
F: (202) 682-1639

M. Patrick Gallagher
mpgallagher@mdgg.com
Martell, Donnelly, Grimaldi &
Gallagher, P.A.
11222 York Road, Second Floor
Hunt Valley, MD 21030
T: (410) 771-0800
F: (410) 510-1322

*Attorney for Appellant/Defendant*
*Contemporary Services Corporation*

Paul M. Finamore
pfinamore@pklaw.com
Halle P. Gray
hgray@pklaw.com
Pessin Katz Law, P.A.
10500 Little Patuxent Pkwy., Suite 650
Columbia, MD 21044
T: (410) 740-3170
F: (667) 275-3056

*Attorneys for Appellants/Defendants*
*Pro-Football, Inc. and WFI Stadium*
*Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains <u>11,495</u> words.

2.     This document complies with the typeface requirements because: this document has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman.

Respectfully submitted this 28th day of December 2023.

*/s/ Joe G. Hollingsworth*
Joe G. Hollingsworth
Hollingsworth LLP

*Attorney for Appellants/Defendants*
*Pro-Football, Inc. and WFI Stadium Inc.*
