No. 23-2020

# United States Court of Appeals for the Fourth Circuit

MICHAEL A. NAIMOLI, JR.; MORGAN FRENCH; ANDREW COLLINS; and
MARISSA SANTARLASCI,

*Plaintiffs/Appellees,*

v.

PRO-FOOTBALL, INC., a/k/a Washington Commanders Football Team, f/k/a
Washington Football Team, f/k/a Washington Redskins Football Team; WFI
STADIUM, INC., f/k/a JKC Stadium, Inc.; CONTEMPORARY SERVICES
CORPORATION (CSC); and COMPANY DOES (Maintenance Subcontractors at
FedEx Field),

*Defendants/Appellants.*

*Appeal from September 14, 2023 Order of the United States District Court for the
District of Maryland at Greenbelt Denying Defendants' Motion to Compel
Arbitration and Dismiss Plaintiffs' First Amended Complaint and Granting
Plaintiffs' Cross-Motion for Partial Summary Judgment*

## BRIEF ON BEHALF OF PLAINTIFFS-APPELLEES

Robert D. Sokolove, Esquire
WEIR GREENBLATT PIERCE LLP
The Widener Building, 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107–3519
(215) 665–8181
*Counsel for Plaintiffs-Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _____      Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)


_____

 who is _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO


2.      Does party/amicus have any parent corporations?                              YES      NO
        If yes, identify all parent corporations, including all generations of parent corporations:




3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
        other publicly held entity?                                              YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                                                      YES    NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES    NO
        If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                                              YES    NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?                      YES    NO
        If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____          Date: _____

Counsel for: _____

- 2 -

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.  STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III.  STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    A.   Facts Giving Rise to Plaintiffs' Cause of Action . . . . . . . . . . . . .   4

    B.   Facts Pertaining to Gordon's Purchase of the Tickets and
         Plaintiffs' Admission to the Stadium . . . . . . . . . . . . . . . . . . . . . . .   6

    C.   Relevant Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

    D.   The District Court's Ruling Denying Defendants' Motion
         to Compel Arbitration and Dismiss and Granting Plaintiffs'
         Cross-Motion for Partial Summary Judgment . . . . . . . . . . . . . . . . 11

IV.  SUMMARY OF LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . 19

V.  LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    A.   Defendants Have Waived Certain Of Their Appellate
         Arguments By Failing To Raise Them In The District
         Court, And Their Failure To Raise The Issue Of Fundamental
         Error On Appeal Defeats Defendants' Challenge Of The
         District Court's September 14th Order Based Upon The
         Waived Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    B.   The District Court Properly Concluded That Based On
         The Record, Material Facts Precluded The Court From
         Finding That Gordon Agreed To The WFT Terms &
         Conditions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

C.    No Remand To The District Court For Discovery On The
      Issue Of Whether Gordon Agreed To The WFT Terms &
      Conditions, Including The Arbitration Agreement, Is
      Necessary Because The District Court's Ruling Was Not
      Based On This Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

D.    Plaintiffs Should Not Be Compelled To Arbitrate Their
      Negligence Claims Against CSC Because CSC Is Not A
      Party To The WFT Terms & Conditions And The
      Circumstances That Would Warrant This Relief Are Not
      Present . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

CERTIFICATION OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATION OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

TABLE OF AUTHORITIES

CASES                                                                    Page

*Agra, Gill & Duffus, Inc. v. Benson,*
    920 F.2d 1173 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.,*
    369 F.3d 385 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Carducci v. Regan,*
    714 F.2d 171 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Dickerson v. Longoria,*
    995 A.2d 721 (Md. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hicks v. Ferreyra,*
    965 F.3d 302 (4th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-22, 28

*Holly Hill Farm v. United States of America,*
    447 F.3d 258 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*IGEN Int'l Inc. v. Roche Diagnostics GmbH,*
    335 F.3d 303 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Celotex Corp.,*
    124 F.3d 619 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Under Seal,*
    749 F.3d 276 (4th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 22
                                                      25, 26

*Fusha v. Delta Airlines, Inc.,*
    No. RDB-10-2517, 2011 WL 3849657 (D. Md. Aug. 30, 2011) . . . . . . 33

*J.J. Ryan & Sons,*
    863 F.2d 315 (4th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Kingman Park Civic Ass'n v. Williams,*
    348 F.3d 1033 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Lee v. Intelius Inc.,*
    737 F.3d 1254 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Legg's Estate v. Comm'r,*
    114 F.2d 760 (4th Cir. 1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Long v. Silver,*
    248 F.3d 309 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38, 39

*Lyles v. Chegg, Inc.,*
    RDB-19-3235, 2020 WL 1985043 (D. Md. Apr. 27, 2020) . . . . . . .29-30, 33

*Rankin v. Brinton Woods, LLC,*
    211 A.3d 645 (Md. Ct. Spec. App. 2019) . . . . . . . . . . . . . . . . . . . . . .16, 25

*Richison v. Ernest Grp., Inc.,*
    634 F.3d 1123 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25-26

*Robinson v. Equifax Info. Servs., LLC,*
    560 F.3d 235 (4th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sgouros v. TransUnion Corp.,*
    817 F.3d 1029 (7th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Stewart v. Hall,*
    770 F.2d 1267 (4th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Byers,*
    649 F.3d 197 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Olano,*
    507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) . . . . . . . . . . . . 22

*Wood v. Milyard,*
    566 U.S. 463, 132 S.Ct. 1826, 182 L.Ed.2d 733 (2012) . . . . . . . . . . . . 21


STATUTES

Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* . . . . . . . . . . . . . . . . . . . . . . .22, 24-25

Maryland Uniform Arbitration Act,
      Md. Code Ann., Cts. & Jud. Proc. §§ 3-201 through 3-234 . . . . . . . . .24-25

RULES

Fed.R.App.P. 28(a)(8)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

# I. INTRODUCTION

Defendants have forfeited and waived the leading issues they attempt to present on appeal. Their assertions that the district court erred by not analyzing legal issues in accordance with legal theories Defendants never presented to the district court, and instead raise for the first time in Defendants' opening appeal brief, without explanation, are improper. Defendants also have made no attempt to establish why this Court should consider their newly raised arguments and reverse the district court. The reason is plain; Defendants cannot establish "fundamental error" by the district court or a denial of fundamental justice.

The district court was presented with the issue of whether the arbitration clause Defendants sought to enforce was part of any agreement between the parties. The district court was correct to evaluate this issue pursuant to Maryland state law pertaining to the formation of contracts, which was the law that Defendants argued applied to this case in both motions it filed seeking to compel arbitration.

The attempt by Defendants and *Amicus Curiae* Atlantic Legal Foundation to expand the scope and reach of the district court's ruling beyond the issue presented to the district court is unavailing. It is clear that the district court's ruling was properly based upon the particular facts of this case pertaining to the acquisition and use of the electronic tickets purchased by one of the Plaintiffs' cousins from a website containing various sets of terms and conditions from more than one business

entity. The issue before the district court is not about "*anyone* entering a sporting event, theme park, concert, or performance"; rather, it is about whether the four Plaintiffs here, who did not purchase the electronic tickets from any of the Defendants, and who never possessed the electronic tickets, agreed to waive their right of access to the courts and right to a trial by jury for their personal injury claims against Defendants by simply using the electronic tickets to gain entry to the football stadium. Since (i) no such agreement exists, (ii) Defendants failed to demonstrate that Plaintiffs were bound by the terms of that contract in any event, and (iii) Defendants have not addressed any fundamental error committed by the district court or a denial of fundamental justice, there is no basis to reverse the district court and its September 14, 2023 order (a) denying Defendants' Motion to Compel Arbitration and Dismiss Plaintiffs' First Amended Complaint ("Motion to Compel and Dismiss") and (b) granting Plaintiffs' Cross-Motion for Partial Summary Judgment ("Cross-Motion for Partial Summary Judgment").

## II.  STATEMENT OF THE ISSUES

A.  Since Defendants failed to raise the issue of fundamental error on appeal, whether Defendants have forfeited and waived the arguments they now raise for the first time on appeal to this Court, specifically, (i) that the district court should have applied the federal substantive law of arbitrability to the issue of whether the arbitration clause was part of an agreement between the parties, including the federal

equitable estoppel "direct benefits" doctrine and the federal common law on agency, and not Maryland state law, (ii) that even under Maryland state law, Plaintiffs are estopped from repudiating the arbitration clause, (iii) that the FAA preempts Maryland state law on the issue of apparent authority, and (iv) Plaintiffs are third-party beneficiaries of the ticket license?

Suggested Answer: Yes.

B.    Whether the district court properly concluded, based upon the record, that material facts precluded the court from finding that Gordon agreed to the Washington Football Team's terms and conditions, including the arbitration clause?

Suggested Answer: Yes.

C.    Whether this Court should remand this case to the district court for further discovery on the issue of whether Gordon agreed to the Washington Football Team's terms and conditions, including the arbitration clause, when the district court's ruling was not based on that issue?

Suggested Answer: No.

D.    Whether, in the event this Court finds Plaintiffs bound by the arbitration agreement, Plaintiffs should be compelled to arbitrate their negligence claim against Contemporary Services Corporation, who is a non-party to the alleged arbitration agreement?

Suggested Answer:  No.

## III.  STATEMENT OF THE CASE

### A.  Facts Giving Rise to Plaintiffs' Cause of Action

On January 2, 2022, Michael A. Naimoli, Jr. ("Naimoli"), Morgan French, Andrew Collins and Marissa Santarlasci (collectively, "Plaintiffs"), all residents and citizens of New Jersey, traveled from their homes to FedExField in Landover, Maryland, to attend a National Football League ("NFL") game between the Philadelphia Eagles and the then-Washington Football Team. JA[1] 56, 59 (Plaintiffs' First Amended Complaint ("Am. Compl.") ¶ 15). The tickets for the game were purchased by Naimoli's cousin, Brandon Gordon ("Gordon"), from a website known as TickPick, a third-party ticket outlet. JA 59 (Am. Compl. ¶ 16).

At the conclusion of the football game, Plaintiffs walked from their seats in the stadium toward the tunnel area of the stadium through which the Philadelphia Eagles' players were departing the football field to head toward the Philadelphia Eagles' locker room following a 20-16 victory by the Philadelphia Eagles. JA 60 (Am. Compl. ¶ 24). Plaintiffs planned to greet members of the Philadelphia Eagles as they began to pass through the tunnel and head toward their locker room. JA 60 (Am. Compl. ¶ 25).

Plaintiffs allege that they sought and gained permission from Contemporary Services Corporation ("CSC"), their employees and agents, all of whom were

---

[1] "JA" refers to the parties' Joint Appendix submitted on December 28, 2023.

providing security and crowd control and management at the venue, before entering the area adjacent to the tunnel. JA 60 (Am. Compl. ¶ 26). Plaintiffs allege that CSC guided them to a railing adjacent to the tunnel and that CSC, as well as all the remaining defendants[2] (collectively, "Defendants"), knew that the area adjacent to the tunnel was a regular gathering location of football fans following a football game and that fans would typically lean up against and over the railing above the entryway for the tunnel (which railing was approximately five to 10 feet above the tunnel entrance) to obtain a handshake or "high five" from the players, or articles from the game such as headbands, wristbands and other game-used materials from the players. JA 61 (Am. Compl. ¶¶ 27-29).

On the day in question, this railing system dislodged and otherwise failed, and Plaintiffs and others, upon leaning against the railing, fell onto the concrete floor of the tunnel area below, including upon one another and others who had fallen. JA 62 (Am. Compl. ¶¶ 33, 39-40). Plaintiffs suffered injuries resulting from the fall, from the forceful removal by CSC of the railing with which they had become entangled, and from being forcefully lifted off the ground by CSC, without regard for the

---

[2] The professional football team playing under the authority of the NFL, Pro-Football, Inc. a/k/a Washington Commanders Football Team, previously known as Washington Football Team, previously known as Washington Redskins Football Team (the "Washington Football Team" or "WFT"); the professional football stadium, WFI Stadium, Inc., previously known as JKC Stadium, Inc. (the "Stadium"); and, maintenance subcontractors providing maintenance and design services to and on behalf of WFT and/or the Stadium at the stadium, Company Does.

injuries Plaintiffs suffered. JA 63, 64 (Am. Compl. ¶¶ 41-43, 51). Plaintiffs were then physically and forcefully directed and shuttled back over the wall from where they had fallen and told by CSC to "get the f--- out of the stadium." JA 63 (Am. Compl. ¶ 45). Plaintiffs then left the Stadium and drove back to New Jersey. JA 65 (Am. Compl. ¶ 54).

### B. Facts Pertaining to Gordon's Purchase of the Tickets and Plaintiffs' Admission to the Stadium.

Information pertaining to how the tickets were purchased and used on the day in question was provided to the district court by way of declarations from Gordon, Taylor Laurer, Vice President of Live Events, Ticket Service Operations for Pro-Football, Inc., and Matthew Carabajal, Senior Director of Ticket Operations for the Washington Football Team. Also submitted were exhibits consisting primarily of screen-capture images from various communication devices.

On December 27, 2021, six days before the football game, Naimoli's cousin, Gordon, purchased nine tickets through TickPick. JA 135 (Declaration of Brandon Gordon ("Gordon Decl.") ¶ 3). At that time, when a ticket purchase was made through TickPick, the purchaser was sent a link to access the tickets through the Washington Football Team's specific ticketing webpage contained within the Ticketmaster website, which was specifically designed with Washington Football Team branding (the "WFT/Ticketmaster Website"). JA 136 (Gordon Decl. ¶¶ 5, 6); JA 178 (Declaration of Matthew Carabajal ("Carabajal Decl.") ¶ 4 and Note 2).

Users were required to log in using their Ticketmaster account information to access their tickets. JA 136 (Gordon Decl. ¶ 7); JA 178 (Carabajal Decl. ¶ 5).

In connection with his purchase, on December 27, 2021, Gordon received a confirmation email from TickPick and an email from the "Washington Football Team Ticket Office" (reflecting a Ticketmaster domain) directing him to accept the tickets he purchased. JA 136, 139-140, 147-149 (Gordon Decl. ¶ 5; Exhibits 1 and 3). Gordon signed into his Ticketmaster account prior to the game, accessed the electronic tickets and placed them into his Apple Wallet application on his iPhone. JA 136 (Gordon Decl. ¶ 7); JA 179 (Carabajal Decl. ¶ 6).

When Gordon purchased the tickets through TickPick, he was required to agree to TickPick's user agreement; but he was never prompted to click on, review or accept terms and conditions from the Washington Football Team, the Stadium or CSC. JA 136 (Gordon Decl. ¶ 6). When the tickets became available, Gordon was prompted to sign into Ticketmaster, but no terms and conditions between customers and any of the Defendants appeared on the WFT/Ticketmaster Website. *Id.*

The electronic tickets Gordon purchased reflected the name, date and location of the event, the section, row and seat numbers for the tickets purchased, entry information and a QR code. JA 136, 151 (Gordon Decl. ¶ 8; Exhibit 4). The face of the ticket contained no terms and conditions from the Washington Football Team, the Stadium or CSC, nor any directions that Gordon should click on a link, visit a

website or review the back of the ticket to read terms and conditions establishing an agreement between him or any members of his party, and the Washington Football Team, the Stadium or CSC. *Id*.

As Gordon, Plaintiffs and the other members of the party prepared to enter the Stadium, Gordon accessed the electronic tickets in his Apple Wallet and presented them to the ticket-taker for scanning, one at a time. JA 136-137 (Gordon Decl. ¶ 9).[3] All members of Gordon's party, including the Plaintiffs, then entered the Stadium. *Id.* The ticket-takers did not provide any of Gordon's party, including Plaintiffs, with terms and conditions establishing a contractual relationship with the Washington Football Team, the Stadium or CSC, and no such terms and conditions were posted at the entrances of the Stadium. JA 137 (Gordon Decl. ¶¶ 10-11).

Naimoli provided a Declaration confirming Gordon's explanation pertaining to the manner in which the party entered the Stadium, the fact that the ticket-takers did not provide anyone with terms and conditions establishing a contractual relationship with the Washington Football Team, the Stadium or CSC, and the absence of any posting of such terms and conditions at the entrance to the Stadium. JA 153, 154 (Declaration of Michael A. Naimoli, Jr. ("Naimoli Decl.") ¶¶ 2, 6-9).

---

[3] At the time of filing the Amended Complaint, not all the facts pertaining to the purchase and use of the tickets were known. The Gordon Decl. reflects Plaintiffs' counsel's subsequent investigation and clarifies how the tickets were purchased and used on the day in question.

Neither Naimoli nor any of the Plaintiffs ever had the tickets in their possession. JA 153 (Naimoli Decl. ¶ 4).

### C. Relevant Procedural History

Plaintiffs commenced this action by way of Complaint on September 9, 2022. JA 3. On November 16, 2022, Defendants filed a Motion to Compel Arbitration and Dismiss. JA 4. Defendants' Motion to Compel Arbitration and Dismiss was denied without prejudice on November 17, 2022, by "paperless order". JA 4. Defendants then refiled their Motion to Compel Arbitration and Dismiss the following day, November 18, 2022. JA 5, 31.

Following a Case Management Conference conducted on January 4, 2023, the district court entered an order granting Plaintiffs leave to file an Amended Complaint and set forth deadlines for the parties to file and oppose motions to dismiss. JA 6, 55.

On January 20, 2023, Plaintiffs filed their Amended Complaint, which contained additional allegations pertaining to the purchase of the tickets. JA 78-79 (Am. Compl. ¶¶ 16-23). The Amended Complaint asserts three claims for negligence/gross negligence: Count I is against the Washington Football Team and the Stadium; Count II is against CSC; and Count III is against unnamed maintenance contractors at the Stadium. JA 65-73.

On February 3, 2023, Defendants filed their Motion to Compel and Dismiss. JA 6. On February 22, 2023, Plaintiffs filed an opposition to Defendants' Motion to Compel and Dismiss and a Cross-Motion for Partial Summary Judgment. *Id.* Plaintiffs requested that the district court find, as a matter of law, that there was no agreement to arbitration between Plaintiffs and Defendants because neither Gordon nor any of the Plaintiffs ever agreed to the WFT Terms & Conditions or otherwise entered into a contract containing those terms. JA 121. On March 3, 2023, Plaintiffs filed a supplement to their opposition to Defendants' Motion to Compel and Dismiss and Cross-Motion for Partial Summary Judgment. JA 6. The same day, Defendants filed a reply in support of their Motion to Compel and Dismiss and an opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment. JA 6-7.

On March 24, 2023, Plaintiffs filed a Motion for Leave to File a Surreply to Defendants' reply in support of their Motion to Compel Arbitration and Dismiss ("Motion for Leave to File Surreply"). JA 7. Defendants filed a response in opposition to Plaintiff's Motion for Leave to File Surreply on March 30, 2023. *Id.* On September 14, 2023, the district court entered an order granting in part and denying in part Plaintiffs' Motion for Leave to File Surreply. *Id.*; JA 238-39. Plaintiffs filed their Surreply later in the day on September 14, 2023. JA 7.

Thereafter, on September 14, 2023, the district court entered an order denying Defendants' Motion to Compel and Dismiss and granting Plaintiffs' Cross-Motion

for Partial Summary Judgment (the "September 14th Order"). JA 288-89. The district court filed a Memorandum Opinion ("Mem. Op.") to accompany the September 14th Order. JA 264-287. On September 27, 2023, Defendants filed a Notice of Appeal of the September 14th Order. JA 290.

### D. The District Court's Ruling Denying Defendants' Motion to Compel Arbitration and Dismiss and Granting Plaintiffs' Cross-Motion for Partial Summary Judgment.

The district court applied the summary judgment standard of review and considered materials beyond the pleadings filed by the parties. JA 271. (Mem. Op. 8-9). Based upon the multiple declarations submitted in support of the competing motions, including the exhibits annexed to the declarations, the district court pieced together the steps undertaken by Gordon to purchase the tickets, the interplay among various websites, the use of hyperlinks and pop-ups on the WFT/Ticketmaster Website, and Plaintiffs' use of the tickets on the day in question. The court articulated the "only issue in dispute" as follows: "whether the arbitration clause was part of an agreement between the parties." JA 273 (Mem. Op. 10).

Specifically noting that "Defendants assert, and Plaintiffs do not dispute, that Maryland law applies to this case," the district court analyzed the issue of contract formation under Maryland law principles. *Id.*; *see also* JA 101-02, 105-06 and 168 (Defendants' Motion to Compel and Dismiss 5-6, 9-10; Defendants' opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment 5) ("***In deciding whether***

*the arbitration clause constituted a valid and enforceable contract, this Court must apply traditional principles of Maryland contract law* and focus on whether the website user (Mr. Gordon) had actual or constructive knowledge of the Ts&Cs and manifested assent to them") (emphasis added).

The district court re-stated Defendants' contention that Gordon manifested assent to the WFT's Terms & Conditions in three ways: (1) moving past the log-in screen on the WFT/Ticketmaster Website; (2) clicking "Agree" when a copy of the WFT's Terms & Conditions appeared in a pop-up window; and (3) downloading and using the electronic tickets which contained WFT's Terms & Conditions on their electronic "back." JA 273-74 (Mem. Op. 10-11). The district court noted Plaintiffs' counter-position that no contract was formed because Gordon did not actually accept the WFT's Terms & Conditions and that the presentation of the WFT's Terms & Conditions in the ways highlighted by Defendants did not provide adequate notice to Gordon of their existence or contents. JA 274 (Mem. Op. 11).

Ultimately, the district court found "a factual dispute that precludes a finding of a valid contract" at this time. JA 276 (Mem. Op. 13). The court observed Plaintiffs' assertion that, "[U]pon signing into the WFT/Ticketmaster Website, the pop-up window with the clickwrap agreement initially displays the Ticketmaster Terms of Use, not the WFT Terms and Conditions. . . [and] Although the WFT Terms & Conditions can be accessed from that screen by clicking on a separate

button, [Plaintiffs] assert that if a user clicks 'Agree' as to the Ticketmaster Terms of Use, the pop-up window disappears, and the user can proceed without ever viewing the WFT Terms & Conditions." *Id.* The court also observed that Defendants "appear to claim that it is the WFT Terms & Conditions that first appear on this screen, [but] they have not provided evidence that clearly refutes Plaintiffs' claim, and [Defendants'] exhibits corroborate Plaintiffs' assertion that the pop-up window shows two tabs, one for Ticketmaster Terms of Use and one for WFT Terms & Conditions." *Id.* The district court found:

> Significantly, the window contains no statement that users must view and agree to both sets of terms. Under these circumstances this factual dispute is material because if Gordon moves past the pop-up window by viewing and agreeing only to the Ticketmaster Terms of Use, which do not include the arbitration agreement, he would not have agreed to the WFT Terms and Conditions.

JA 276 (Mem. Op. 13).

The district court further found that "[t]his same issue impacts the question of whether the browsewrap agreement at the log-in page could establish an agreement to the WFT Terms & Conditions, because Plaintiffs have asserted, and provided a screen-capture image showing, that clicking on the hyperlink on the log-in page for 'Terms of Use' takes the user initially to a window with Ticketmaster Terms of Use displayed, along with a tab for the WFT Terms & Conditions, but with no language warning the user that the WFT Terms & Conditions are part of the 'Terms of Use' referenced on the log-in page and must also be reviewed." JA 276-77 (Mem. Op. 13-

14). Finding Carabajal's declaration problematic because (i) he was not employed by the Washington Football Team at the time of the events in question, (ii) he presented an after-the-fact re-creation of the conditions allegedly in place at the time of the events and it is uncertain that his information is any more reliable than that presented by Plaintiffs, and (iii) he raises additional questions, such as the difference in the language of the WFT Terms & Conditions appearing on the pop-up as compared to the "back" of the electronic ticket, the district court found that it "cannot make a determination of whether Gordon agreed to the WFT Terms & Conditions and the arbitration clause based on the present record . . ." JA 277 (Mem. Op. 14).

The district court also rejected Defendants' third basis for finding that a contract was formed—the presence of the WFT Terms & Conditions on the "back" of the electronic ticket. Observing that the only way a user could learn that the WFT Terms & Conditions were meant to be part of the ticket would be to click on a small circle with three dots in the upper right corner of the ticket, which contained no language directing the user to click on it or informing the user that doing so would lead to the WFT Terms & Conditions which are part of a contract to which the user was agreeing, the district court found Defendants' "unmarked, tiny graphic" failed to provide sufficient notice to establish constructive knowledge of the WFT Terms & Conditions, and instead finding that "this design constituted a 'hide-the-ball'

exercise that courts have found insufficient to establish a contract." (citation omitted), JA 277-78 (Mem. Op. 14-15).

In sum, the district court found genuine issues of material fact on the means by which Defendants can establish that Gordon entered into a contract including the arbitration clause which precludes ruling in favor of Defendants. *Id.* The court then explained that it was not ordering discovery on these issues, because it finds that "regardless of whether Gordon entered into a contract including the arbitration clause, Defendants have not demonstrated that Plaintiffs were bound by the terms of that contract." JA 278 (Mem. Op. 15).

The district court next addressed the law of agency and the principles of actual and apparent authority under Maryland law. JA 279-284 (Mem. Op. 16-21). "[W]hen seeking to bind a non-signatory to an arbitration clause or agreement, actual authority requires either a specific grant of authority to enter into the agreement in question, or at least a past history of acquiescing to the same agent entering into similar agreements on the principal's behalf." JA 282 (Mem. Op. 19). Finding no evidence that Plaintiffs conferred on Gordon actual authority to enter into a contract, much less one that included an arbitration clause, and no evidence of any past history of Gordon regularly acting as an agent for purposes of ticket purchases for Plaintiffs, particularly ones having contracts with arbitration clauses, the district court found that Gordon had no actual authority to bind Plaintiffs to the arbitration clause. *Id.*

Following a Maryland Supreme Court case and a Maryland appellate decision that followed it, *Dickerson v. Longoria,* 995 A.2d 721 (Md. 2010) and *Rankin v. Brinton Woods, LLC,* 211 A.3d 645 (Md. Ct. Spec. App. 2019), respectively, the district court explained that under Maryland law, there exists the general requirement of some written or spoken words or conduct of the principal to cause a reasonable belief of agency for there to be apparent authority, and that apparent authority is not established absent some conduct by the purported principal demonstrating to the third party that the purported agent "had the authority to waive his right of access to the courts and right to a trial by jury by signing an arbitration agreement on his behalf." JA 283 (Mem. Op. 20) (citation omitted). The district court found that Plaintiffs took no actions that could be construed as communicating that they had given Gordon the authority to enter into the contract. It explained:

> Here, there is no claim or evidence that Plaintiffs were aware of the arbitration clause, or even the WFT Terms & Conditions more generally, so the Court cannot find that Gordon had apparent authority to enter into a contract containing an arbitration clause, or that Plaintiffs later ratified or assented to the contract and its arbitration clause.

JA 284 (Mem. Op. 21).

Significantly, the district court observed that "Defendants have not actually articulated their specific agency theory or sought to apply the requirements for actual

16

authority or apparent authority under Maryland law to the present facts."[4] *Id.* "Defendants rely almost entirely on multiple cases involving claims arising on cruise ships" pertaining to forum selection clauses and limitations periods from outside the Fourth Circuit, the District of Maryland, and none of which apply Maryland law. JA 284-85 (Mem. Op. 21-22). The district court rejected application of the cruise ship cases as incompatible both factually and legally. *Id.* (Finding it "far from clear that the expectations for receiving and reviewing specific contract terms associated with cruise ship tickets, which are for a multi-day journey on an ocean-going vessel into international waters with overnight lodging, are necessarily applicable to tickets to attend a three-hour sporting event" and that such cases, some of which are unpublished, do not analyze the elements of agency, "much less the specific agency rules applicable in Maryland, and none involve arbitration clauses.")

The district court declared that it still would not find Plaintiffs bound by the WFT Terms & Conditions even if the cruise ship cases were viewed by it as creating a special exception from Maryland law on agency because (i) the tickets in question were only available to Plaintiffs for a short time (approximately 12 hours) prior to

---

[4] Defendants' Motion to Compel and Dismiss, as well as the two versions of the same motion filed in connection with Plaintiffs' original complaint, are devoid of arguments involving the equitable estoppel "direct benefits" doctrine, federal agency law on apparent authority or Maryland law on estoppel. JA 31-53, 94-119. *See also,* Defendants' reply in support of Motion to Compel and Dismiss, which is also devoid of these arguments. JA 164-198.

the commencement of the game, as compared to the cruise ship cases where the tickets were available to the passengers 17 to 30 or more days before voyage, JA 285-86 (Mem. Op. 22-23), and (ii) Plaintiffs did not have the kind of opportunity to review the contract that was present in the cruise ship cases because (a) Plaintiffs never had actual possession of the electronic tickets, and (b) at the time that Gordon and Plaintiffs were together prior to entering the stadium, the only copy of the WFT Terms & Conditions that Gordon and Plaintiffs could have accessed was the version on the "back" of the electronic ticket "which was not identified in a way that anyone could reasonably have been aware of its existence." JA 286-87 (Mem. Op. 23-24). Finally, the district court finds that the plaintiffs in the cruise ship cases, even if they did not have an opportunity to read the contract before the cruise, had ample time after the cruise to read the contract and comply with the shorter limitations period, which is a scenario not applicable to an arbitration clause. JA 287 (Mem. Op. 24).

Following Maryland law, as the parties directed, the district court found that Defendants did not meet their burden to establish that Gordon was Plaintiffs' agent such that Plaintiffs are bound by the arbitration clause and does not address the argument that the claims against CSC are subject to arbitration because they are intertwined with the other claims that will be sent to arbitration. *Id*.

## IV. SUMMARY OF LEGAL ARGUMENT

Remarkably, the leading arguments advanced by Defendants on appeal (and the only arguments advanced by *Amicus Curiae* Atlantic Legal Foundation ("ALF")) were not argued before the district court and are improperly raised for the first time on appeal. Defendants ignore this evident situation and compound it by failing to argue that their newly raised arguments establish fundamental error or a denial of fundamental justice. Having failed to raise the issue of fundamental error on appeal, the leading arguments Defendants and ALF raise on appeal are forfeited and waived.

This case turns upon its unique facts involving an electronic ticketing website that contains not only "clickwrap" and "browsewrap"/"sign-in wrap" agreements, but more importantly, contains the terms of use and/or terms and conditions of two separate and district entities, Ticketmaster and the Washington Football Team. The district court analyzed the issue presented and properly concluded that material facts precluded the court from finding that Gordon agreed to the WFT Terms & Conditions, including the arbitration clause.

Nevertheless, this determination by the district court was not the basis for the September 14th Order and, therefore, it is not necessary for this Court to remand this case to the district court for further discovery on the issue of whether Gordon agreed to the WFT Terms & Conditions. The district court found that even if Gordon is deemed to have agreed to the WFT Terms & Conditions, Defendants did not

adequately demonstrate that Plaintiffs were bound by the WFT Terms & Conditions based upon state agency law and actual and apparent authority.

Lastly, should this Court find Plaintiffs bound by the arbitration agreement, Plaintiffs should not be compelled to arbitrate their negligence claim against CSC, who is a non-party to the alleged arbitration agreement, because the circumstances that would allow a non-signatory to an arbitration agreement to enforce it are not present here.

## V. LEGAL ARGUMENT

### A. DEFENDANTS HAVE WAIVED CERTAIN OF THEIR APPELLATE ARGUMENTS BY FAILING TO RAISE THEM IN THE DISTRICT COURT, AND THEIR FAILURE TO RAISE THE ISSUE OF FUNDAMENTAL ERROR ON APPEAL DEFEATS DEFENDANTS' CHALLENGE OF THE DISTRICT COURT'S SEPTEMBER 14TH ORDER BASED UPON THE WAIVED ARGUMENTS.

Forfeiture and waiver rules offer "respect for the [integrity of the] lower court, [avoid] unfair surprise to the other party, and [acknowledge] the need for finality in litigation and conservation of judicial resources." *Holly Hill Farm v. United States of America,* 447 F.3d 258, 267 (4th Cir. 2006) (citations and quotations omitted). Waiver rules also ensure that the parties develop the necessary evidence below, and prevent parties from getting two bites at the apple by raising two distinct arguments. *In re Under Seal,* 749 F.3d 276, 286 (4th Cir. 2014) (citations and quotations omitted). The Supreme Court has warned appellate courts not to lightly dismiss the

many interests underlying preservation requirements. *Under Seal, id.* (citing *Wood v. Milyard,* 566 U.S. 463, 132 S.Ct. 1826, 1834, 182 L.Ed.2d 733 (2012) ("Due regard for the trial court's processes and time investment is also a consideration appellate courts should not overlook."))

It is well established that the Fourth Circuit Court of Appeals "do[es] not consider issues raised for the first time on appeal," "[a]bsent exceptional circumstances." *Hicks v. Ferreyra,* 965 F.3d 302, 310 (4th Cir. 2020), *quoting Robinson v. Equifax Info. Servs., LLC,* 560 F.3d 235, 242 (4th Cir. 2009) (internal quotations marks omitted); *see also Agra, Gill & Duffus, Inc. v. Benson,* 920 F.2d 1173, 1176 (4th Cir. 1990) ("We will not accept on appeal theories that were not raised in the district court except under unusual circumstances.").

"When a party in a civil case fails to raise an argument in the lower court and instead raises it for the first time before [the Fourth Circuit Court of Appeals, the Fourth Circuit Court of Appeals] may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice." *Hicks, id. quoting In re Under Seal,* 749 F.3d 276, 285 (4th Cir. 2014) (citation omitted). Notably,

> "This rigorous standard is an even higher bar than the 'plain error' standard applied in criminal cases, *see Stewart v. Hall,* 770 F.2d 1267, 1271 (4th Cir. 1985) (explaining that in a civil case such 'fundamental error' must be 'so serious and flagrant that it goes to the very integrity' of the proceedings (internal quotations marks omitted)), and the burden

> is on the party who has failed to preserve an argument to show that the
> standard is met, *see Under Seal,* 749 F.3d at 292."

*Hicks,* 965 F.3d at 310. Indeed, when a party in a civil case fails to meet the plain-

error standard, the Court can say with confidence that he/she/they has not established

fundamental error. *Under Seal,* 749 F.3d at 286 (citing *In re Celotex Corp.,* 124 F.3d

619, 631 (4th Cir. 1997) (describing the criminal plain-error standard as a

"minimum" standard that must be met before undertaking discretionary review of a

waived argument in a civil case)).[5]

Defendants argued in their Motion to Compel and Dismiss that a litigant can

compel arbitration under the Federal Arbitration Act (the "FAA") if the litigant can

demonstrate: (1) the existence of a dispute between the parties; (2) a written

agreement that includes an arbitration provision which purports to cover the dispute;

(3) the relationship of the transaction which is evidenced by the agreement to

---

[5] The Fourth Circuit uses the criminal, plain-error standard articulated by the United States Supreme Court in *United States v. Olano,* 507 U.S. 725, 730, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) as an intermediate step in evaluating fundamental error in civil cases. *See e.g., Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.,* 369 F.3d 385, 396 (4th Cir. 2004) (applying *Olano* standard in civil case). Under this standard, the appellate court cannot reverse if the party fails to establish: "(1) there is an error; (2) the error is plain; (3) the error affects substantial rights; and (4) the court determines…that the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Under Seal,* 749 F.3d at 286, *quoting Celotex,* 124 F.3d at 630-31. Even the lesser showing needed for '[p]lain error review is strictly circumscribed, and meeting all four prongs is difficult, as it should be." *Under Seal, id., quoting United States v. Byers,* 649 F.3d 197, 213 (4th Cir. 2011) (quotation marks and alteration omitted).

interstate commerce; and (4) refusal of the opposing party to arbitrate the dispute. JA 99. Defendants next argued that each of these elements exists. Primarily focusing on element (2), Defendants asserted that Maryland law governs whether a binding arbitration agreement exists, that the arbitration agreement is valid and enforceable under Maryland law, that Plaintiffs consented to the arbitration clause through their actions, that under Maryland law, the arbitration clause is supported by adequate consideration, and that all of Plaintiffs' claims fall within the arbitration clause.[6] JA 101.

In their reply brief in support of their Motion to Compel and Dismiss and in opposition to Plaintiff's Cross-Motion for Partial Summary Judgment, Defendants submit the declaration of Mr. Carabajal to present the steps they claim Gordon followed to purchase the electronic tickets, and they argue that Gordon had notice of and assented to the arbitration clause, and that Gordon's notice and assent is imputed to Plaintiffs. JA 166-73, 177.

Defendants now seek to raise, for the first time on appeal, that the issue of whether the arbitration clause was part of an agreement between the parties—an issue which Defendants have now re-cast on appeal as "the arbitrability of plaintiffs' claims"—is not governed by Maryland state law, but instead the federal substantive

---

[6] These arguments were nearly identical to those asserted in Defendants' original Motion to Compel Arbitration and to Dismiss filed on November 18, 2022. JA 36-42.

law of arbitrability, including the federal equitable estoppel "direct benefits" doctrine and the federal common law on agency. Statement of the Issues Nos. 1 and 2; *see also,* Defendants' Opening Appeal Brief ("App. Br."), 19-24, 26-30. Defendants argue estoppel under state law, and then state law preemption by the FAA on the issue of apparent authority. Statement of the Issues No. 3; *see also,* App. Br., 24-26, 31-34. Defendants also argue that Plaintiffs are third-party beneficiaries of the ticket license and, therefore, are bound by the arbitration clause. Statement of the Issues No. 4; *see also,* App. Br., 42-44.

Defendants do not acknowledge that the arguments they now raise for the first time on appeal are new arguments.[7] Defendants have not provided any explanation

---

[7] Defendants assert in footnote 16 that they did not have an opportunity to brief the district court on the issue of preemption of Maryland's "awareness rule" by the FAA, since Plaintiffs did not raise the issue of awareness until their Surreply. This assertion is completely disingenuous. The primary argument in Defendants' reply brief was Gordon's notice and assent (*i.e.,* awareness) to the arbitration clause, and the imputation of Gordon's notice and assent to Plaintiffs. Defendants argued, "[T]his Court **must apply traditional principles of Maryland contract law** and focus on whether the website user (Mr. Gordon) had actual or constructive knowledge of the Ts&Cs and manifested asset to them." JA 168 (emphasis added). The balance of Defendants' reply brief was spent arguing the issue of Gordon's awareness of the arbitration provision. In other words, Defendants encouraged the district court to apply the state law it now urges is preempted by the FAA. Moreover, it is far from clear that the so-called Maryland "awareness rule" (if a rule at all) is preempted by the FAA, as Defendants cite no state or federal cases holding as much. Further, the *Rankin* case relied upon by the district court was decided in 2019 by the Court of Special Appeals of Maryland, which was after the cases upon which Defendants rely upon were decided, and involved an arbitration agreement governed by the Maryland Uniform Arbitration Act, which like the FAA, expresses both a legislative policy favoring enforcement of agreements to arbitrate and a fundamental principal that

for why they did not raise in the district court the arguments they now raise, nor do they attempt to satisfy the "fundamental error" standard or show they can meet it. Defendants have not even attempted to satisfy their burden of establishing the kind of "fundamental error" that might warrant reversal on a ground not raised in the district court. *See Under Seal,* 749 F.3d at 292 (holding that failure to argue on appeal for fundamental error "marks the end of the road for [an] argument for reversal not first presented to the district court" (internal quotations marks omitted)).

Defendants also cannot successfully argue that their new arguments should be considered because they raise pure questions of law, or that this case is one of public concern. Such arguments were expressly rejected by the *Under Seal* Court. Even if the issues are purely legal (a position with which Plaintiffs do not agree), Fourth Circuit precedent does not embrace the approach that purely legal issues can be considered outside the plain-error framework. 749 F.3d at 289-90. "To the contrary, we have taken a more structured view, recognizing that the forfeiture rule 'is a salutary rule even where the ground urged for reversal is a pure question of law.'" *Id., quoting Legg's Estate v. Comm'r,* 114 F.2d 760, 766 (4th Cir. 1940); *accord Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128-30 (10th Cir. 2011) (rejecting a

---

arbitration is a matter of contract. *Rankin,* 211 A.3d 645, 619 (citations omitted); Md. Code. Ann. § 3-206; 9 U.S.C.A. § 1, *et seq.*

party's contention that a forfeited but "purely legal" issue could be considered outside the plain-error framework).

The briefs submitted by Defendants and *Amicus Curiae* Atlantic Legal Foundation purport to argue that the issues presented on appeal have an immense public impact. Plaintiffs disagree; this case is limited to its unique facts and has no implications for persons other than the parties to this case. Even if the issues are of "public concern" (a point which Plaintiffs reject), this Court has declined to find that to be sufficient justification for review. In addition to the "tricky task" and "practical difficulties" of identifying those cases raising matters of public concern and those raising matters of non-public concern, *Under Seal,* 749 F.3d at 291 (citations omitted), there is something to be said for avoiding deciding issues of public concern from a less-than-fully litigated record. *Id.* (citing, *e.g.*, *Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1039 (D.C. Cir. 2003) ("The issue presented, however, is of sufficient public importance and complexity to counsel strongly against deciding it in this posture.")); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C. Cir. 1983) (refusing to excuse procedural waiver where case involved "important questions of far-reaching significance.").

In addition to forfeiting their leading issues on appeal, Defendants also have waived their opportunity to address the "fundamental error" standard. Defendants' Statement of Issues on Appeal do not ask this court to reverse the district court based

upon fundamental error or a denial of fundamental justice. *See e.g., IGEN Int'l Inc. v. Roche Diagnostics GmbH,* 335 F.3d 303, 308 (4th Cir. 2003) ("Failure to present or argue assignments of error in opening briefs constitutes waiver of those issues."); *and see* Fed.R.App.P. 28(a)(8)(A) ("The appellant's brief must contain…(8) the argument, which must contain: (A) appellant's contentions and reasons for them…"). Attempts (if any) by Defendants to address the fundamental error standard in their reply brief is contrary to the letter and spirit of the appellate rules and should not be tolerated.

There exists no exceptional circumstances warranting a review of Defendants' leading arguments. Defendants have waived and forfeited their argument that the district court erred in relying on Maryland state law to determine whether the arbitration clause was part of an agreement between the parties, and instead should have determined this issue based upon the federal substantive law of arbitrability, including the federal equitable estoppel "direct benefits" doctrine and the federal common law on agency. This is especially true where Defendants repeatedly argued to the district court that it should apply Maryland state law to determine this issue. *See, e.g.,* JA 101, 168. Defendants also waived and forfeited their argument that the district court erred in applying Maryland law on the issue of apparent authority, based on preemption. Encouraging the district court to evaluate an issue under state law and then arguing on appeal that the court erred in doing so and, moreover, that

the state law was preempted, should not be tolerated. Defendants waived and forfeited their argument that Plaintiffs are estopped from repudiating the arbitration clause and are third-party beneficiaries of the ticket license and, therefore, are bound by the arbitration clause. Defendants never presented these issues to the district court for consideration and the district court does not address these issues in its ruling. *See Hicks,* 965 F.3d at 311 ("[t]o say that a court must apply a given analysis when it addresses a question is not to say that the court must address that question *sua sponte* when nobody has raised it.").

### B. THE DISTRICT COURT PROPERLY CONCLUDED THAT BASED ON THE RECORD, MATERIAL FACTS PRECLUDED THE COURT FROM FINDING THAT GORDON AGREED TO THE WFT TERMS & CONDITIONS.

Defendants argue that the undisputed material facts show that Gordon had constructive notice of the arbitration agreement and that the district court erred in finding a genuine issues of material fact on this issue. (App. Br., 35; Legal Argument IV.C). Defendants are wrong on both counts.

Defendants argue that Gordon had constructive notice of the arbitration agreement based on the following: (1) moving past the log-in screen on the WFT/Ticketmaster Website; (2) clicking "Agree" when a copy of the WFT Terms & Conditions appeared in a pop-up window; and (3) downloading and using the electronic tickets which contained the WFT Terms & Conditions on its electronic

"back," and that such notice is imputed to Plaintiffs "through an agency relationship based on apparent authority under federal common law."[8] The district court addressed each of Defendants' examples, and properly rejected them.

Defendants argue that the district court failed to discuss the "most relevant decision applying Maryland law to notice of an arbitration clause in an online agreement," *Lyles v. Chegg, Inc.,* RDB-19-3235, 2020 WL 1985043 (D. Md. Apr. 27, 2020), even though it was brought to the court's attention. (App. Br., 37). Defendants cited *Lyles* in their reply brief for the proposition that courts applying Maryland law have upheld clickwrap agreements, which are agreements that require a customer to affirmatively click a box on the website acknowledging receipt of an assent to the contract terms before he or she is allowed to proceed using the website. *Lyles,* 2020 WL 198504 at *3. Defendants now argue that *Lyles* is factually similar, so the Court should find that by signing into the WFT/Ticketmaster Website, Gordon had constructive notice of the WFT Terms & Conditions, including the arbitration agreement. Defendants assert that the layout of the sign-in website in *Lyles* is materially identical to the layout of the sign-in page on the WFT/Ticketmaster Website, as is the warning that by clicking 'sign up'

---

[8] Defendants argued to the district court in their reply brief that these were three examples of Gordon manifesting his assent to (*i.e.,* accepting) the WFT Terms & Conditions, an issue governed by state law. JA 168.

you agree to the terms of the privacy policy. While those facts demonstrate some similarities between *Lyles* and the case on appeal, the facts that distinguish *Lyles* are more compelling.

The website in *Lyles* involved a single set of terms and conditions; specifically, those pertaining to the account the user opened with Chegg, Inc., a provider of education materials. Our case differs dramatically from *Lyles* and involves the WFT/Ticketmaster Website which, as Defendants' exhibits corroborate, provides its users two sets of terms and conditions, one for Ticketmaster and one for WFT, and each of which contains its own, separate click to "Agree". The district court found this fact to be significant to both the agreement on the log-in page and the agreement on the pop-up window page, where two tabs appear, one for the Ticketmaster Terms of Use and one for the WFT Terms & Conditions. *Lyles* is factually distinguishable, not instructive, and the district court properly ignored it.

Further explaining, the log-in page on the WFT/Ticketmaster Website contained a hyperlink leading to the "Terms of Use" and a notice to users that continuing past that page would constitute agreement to the "Terms of Use".[9] By

---

[9] On the log-in page, the following language is displayed in small font (as compared to the font size of other text on the same screen) below the password box and above the sign-in button:

> "By continuing past this page, you agree to the Terms of Use and understand that information will be used as described in both the

referencing a single "Terms of Use" before referencing separate privacy policies of both Ticketmaster and WFT, a reasonable consumer would not have understood that logging-in was an agreement to both the Ticketmaster Terms of Use and the WFT Terms & Conditions. *See e.g. Lee v. Intelius Inc.,* 737 F.3d 1254, 1261 (9th Cir. 2013) (agreeing with district court that plaintiff did not enter into a contract to arbitrate; by clicking the "YES" button, plaintiff objectively manifested his asset to be bound by the "Offer Details" of one company, and not the "Terms and Conditions" of a separate company embedded in hyperlinks); *Sgouros v. TransUnion Corp.,* 817 F.3d 1029 (7th Cir. 2016) (citing *Lee,* 737 F.3d at 1261, for the proposition that "where a website specifically states that clicking means one thing, that click does not bind users to something else.").

Plaintiffs asserted in their Motion for Partial Summary Judgment, and provided to the district court a screen-capture image showing, that clicking on the hyperlink on the log-in page for "Terms of Use" takes the user initially to a window with Ticketmaster Terms of Use displayed, along with a tab to access the WFT Terms & Conditions. The district court noted, however, that the WFT/Ticketmaster Website does not warn users that the WFT Terms & Conditions are part of the

---

Ticketmaster Privacy Policy and Washington Commanders Privacy Policy." (App. Br., 12); JA 185 (Carabajal Decl. Ex. 1).

"Terms of Use" referenced on the log-in page and must also be reviewed and accepted. JA 276-77 (Mem. Op. 13-14).

The WFT/Ticketmaster Website also had a pop-up window, which appeared after users sign-in, containing two tabs, one showing the Ticketmaster Terms of Use and one showing the WFT Terms & Conditions. Each tab contains an "Agree" button. (App. Br., 12, 14). Other than hyperlinks and tabs, the WFT/Ticketmaster Website is void of any prompt directing users to review and accept the WFT Terms & Conditions. The district court found that:

> Significantly, the [pop-up] window contains no statement that users must view and agree to both sets of terms. Under these circumstances this factual dispute is material because if Gordon moves past the pop-up window by viewing and agreeing only to the Ticketmaster Terms of Use, which do not include the arbitration agreement, he would not have agreed to the WFT Terms and Conditions.

JA 276 (Mem. Op. 13).

Defendants contend that so long as the WFT Terms & Conditions were "available" to Gordon to view in the pop-up window before he clicked the "Agree" button to proceed to the next page—regardless of whether the Ticketmaster Terms of Use were displayed in the first tab—nothing more is needed under Maryland law. (App. Br., 40 and note 22). The district court disagreed because "Although the WFT Terms & Conditions can be accessed from [the pop-up] screen by clicking on a separate button, [Plaintiffs] assert that if a user clicks 'Agree' as to the Ticketmaster Terms of Use, the pop-up window disappears, and the user can proceed without ever

viewing the WFT Terms & Conditions." JA 276 (Mem. Op. 13). The disappearance of the WFT Terms & Conditions, if true, renders the WFT Terms & Conditions ***not*** "available"—which is the linchpin to assent, according to Defendants. Defendants did not provide evidence that refuted Plaintiffs' assertion, Defendants' own exhibits corroborate Plaintiffs' assertion of the pop-up window showing multiple tabs, and more compelling, the pop-up window does not explain to the user that they must view and agree to both sets of terms.

Defendants' reliance on *Fusha v. Delta Airlines, Inc.,* No. RDB-10-2517, 2011 WL 3849657 (D. Md. Aug. 30, 2011), for the proposition that Gordon's click on the "Agree" button on the pop-up window "effectively conveyed his agreement to the arbitration clause in the WFT's Terms & Conditions, whether or not he read those terms," *see* App. Br. 39, is also flawed. *Fusha* (which involves a forum selection clause), like *Lyles*, entails the terms and conditions of a single company— here, Airtrade, the operator of the travel-booking website used by plaintiff. Although the *Fusha* Court enforced the clickwrap agreement in that case despite the plaintiff's contention that she did not read the forum selection clause, Plaintiffs' case is distinguishable. Here, the WFT Terms & Conditions could disappear and become unavailable in the pop-up window without the users of the WFT/Ticketmaster Website ever having the opportunity to review and accept them. This is problematic, as is the absence of a clear prompt on the WFT/Ticketmaster Website directing users

to view and accept the WFT Terms & Conditions. These problems are not immaterial, as Defendants suggest.

Defendants' third example of Gordon's assent to the WFT Terms & Conditions does not withstand even a minimum level of scrutiny. Defendants argue that assent to the WFT Terms & Conditions occurred when Gordon downloaded the tickets he purchased into his Apple Wallet on his iPhone because in the top right corner on the "front" of the electronic ticket is a small circle icon containing three dots which, if clicked, brings the ticketholder to the "back" of the electronic ticket where the WFT Terms & Conditions are set forth. JA 180-181 (Carabajal Decl. ¶ 9). Since Gordon had the opportunity to review the WFT Terms & Conditions on any of the tickets stored in his Apple Wallet prior to entering the Stadium, Defendants contend he should be found to have assented to the Terms & Conditions (which assent is then imputed to Plaintiffs). (App. Br., 41-42).

The district court correctly concluded "this basis [to be] entirely insufficient to establish an agreement to a contract." JA 277 (Mem. Op. 14). The image of the downloaded tickets contained no reference to the WFT Terms & Conditions or the existence of a "back" of the electronic ticket, and the circle icon containing three dots did not instruct the purchaser to click on it or that clicking on it would take the purchaser to the WFT Terms & Conditions to which the purchaser was agreeing. The district court "reject[ed]" Defendants' claim that this unmarked circle icon

provided sufficient notice to establish constructive knowledge of the WFT Terms &
Conditions and, furthermore, found this "design constituted a 'hide-the-ball
exercise' that courts have found insufficient to establish a contract." JA 278 (Mem.
Op. 15).

> As to the issue of constructive knowledge, the district court explained:

> When faced with purported contracts formed during online commercial
> activities based on acceptance of a company's terms and conditions,
> courts consider whether there is evidence of actual or constructive
> knowledge of the terms and manifested assent to them….Constructive
> knowledge depends on the "conspicuousness and placement of the
> terms and conditions, as well as the content and overall design" of the
> website, and courts generally will not enforce agreements when the
> terms are "buried at the bottom of the page or tucked away in obscure
> corners of the website, especially when such scrolling is not required to
> use the site," or when "the terms are available only if users scroll to a
> different screen," "complete a multiple-step process of clicking non-
> obvious links," or "parse through confusing or distracting content and
> advertisements."…"[E]ven where the terms are accessible via a
> conspicuous hyperlink in close proximity to a button necessary to the
> function of the website, courts have declined to enforce such
> agreements."…Ultimately, "the onus must be on the website owners to
> put users on notice of the terms to which they wish to bind consumers."

JA 274-75 (Mem. Op. 11-12) (citations omitted). The district court applied these
legal principles to the facts presented by the parties' declarations and exhibits, and
determined that it could not determine whether Gordon agreed to the WFT Terms &
Conditions, including the arbitration agreement, based on the present record.[10] JA

---

[10] Defendants assert that the district court improperly relied on unauthenticated
evidence offered by Plaintiffs in their Surreply, to find a genuine issue of fact
regarding Gordon's assent to the WFT Terms & Conditions through the pop-up

277 (Mem. Op. 14). That said, the district court did not order discovery to be conducted by the parties because it found, regardless of whether Gordon agreed to the WFT Terms & Conditions, including the arbitration agreement, that "Defendants have not demonstrated that Plaintiffs were bound by the terms of that contract." JA 278 (Mem. Op. 15).

### C. NO REMAND TO THE DISTRICT COURT FOR DISCOVERY ON THE ISSUE OF WHETHER GORDON AGREED TO THE WFT TERMS & CONDITIONS, INCLUDING THE ARBITRATION AGREEMENT, IS NECESSARY BECAUSE THE DISTRICT COURT'S RULING WAS NOT BASED ON THIS ISSUE.

The district court denied Defendants' Motion to Compel and Dismiss not because there existed genuine issues of material fact, but rather, "because regardless of whether Gordon entered into a contract including the arbitration clause,

_____

window, specifically Exhibits 2 and 3 to Plaintiff's Surreply. (App. Br., 40-41). This Court need not evaluate whether the district court's consideration of Exhibits 2 and 3 was improper because other evidence tended to show the existence of material factual disputes precluding judgment in favor of Defendants, specifically, the Carabajal declaration, the Gordon declaration and the respective exhibits annexed to each. JA 276 (Mem. Op. 13) ("[Defendants'] exhibits corroborate Plaintiffs' assertion that the pop-up window shows two tabs, one for the Ticketmaster Terms of Use and one for the WFT Terms & Conditions[, … and] no statement that users must view and agree to both sets of terms."); JA 277 (Mem. Op. 14) (finding faults with the Carabajal declaration and concluding that it is "not certain" that Carbajal's information is more reliable than that presented by Plaintiffs). Moreover, the district court ultimately ruled that Defendants failed to demonstrate that Plaintiffs were bound by the terms of the contract based upon agency principles, regardless of whether Gordon assented to the WFT Terms & Conditions.

Defendants have not demonstrated that Plaintiffs were bound by the terms of that contract." JA 278 (Mem. Op. 15). Since the district court did not deny Defendants' Motion to Compel and Dismiss because of genuine issues of material fact—even though it found such genuine issues to exist—there is no reason for the parties to incur additional expenses conducting discovery on these issues and to further delay the adjudication of Plaintiffs' substantive claims for negligence and gross negligence.

### D. PLAINTIFFS SHOULD NOT BE COMPELLED TO ARBITRATE THEIR NEGLIGENCE CLAIMS AGAINST CSC BECAUSE CSC IS NOT A PARTY TO THE WFT TERMS & CONDITIONS AND THE CIRCUMSTANCES THAT WOULD WARRANT THIS RELIEF ARE NOT PRESENT.

CDC, a non-party to the WFT Terms & Conditions and who is not mentioned on the WFT/Ticketmaster Website, claims to have standing to compel Plaintiffs to arbitrate their claims for negligence/gross negligence. The basis for CDC's claim is that Plaintiffs' claims against CSC are intertwined with those against the other Defendants. This argument must be rejected because the circumstances that would allow a non-signatory to invoke an arbitration clause are not present in this case.[11]

---

[11] Based upon its ruling that Defendants failed to meet their burden that Gordon was Plaintiffs' agent and could bind them to the arbitration agreement, the district court did not address the issue of whether Plaintiffs' claims against CSC must be subjected to arbitration. JA 287 (Mem. Op. 24).

Plaintiffs do not dispute that, under the proper circumstances, a non-signatory may invoke an arbitration clause. *Long v. Silver,* 248 F.3d 309, 320 (4th Cir. 2001). Those circumstances require the claims against the non-signatory to be "inherently inseparable" and "intimately founded in and intertwined with" the claims against the party to the arbitration agreement. *See, e.g., J.J. Ryan & Sons,* 863 F.2d 315 (4th Cir. 1988) (when allegations against "a parent company and its subsidiary are based on the same facts and inherently inseparable a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement."); *Long*, 248 F.3d at 320-21. (allowing nonsignatory, defendant shareholders to arbitrate claims that were intertwined with the plaintiff's claims against the signatory corporation that were arbitrable where all of the claims concerned the same contracts.)

No such circumstances are present here. Apparent from the Amended Complaint is that although Plaintiffs plead facts in their Amended Complaint that are common to all Defendants, Plaintiffs have alleged separate facts which independently support their claims against CSC; indeed, Plaintiffs brought a separate claim against CSC for negligence/gross negligence in Count III of the Amended Complaint. JA 68. (Am. Compl. ¶¶ 69-89). Plaintiffs' claim against CSC arises from its role as a security and crowd control organization, responsible for maintaining control, providing safety, assisting in emergencies, addressing accidents and

generally insuring the well-being of spectators and other invitees at the Stadium. JA 68 (Am. Compl. ¶ 70). Plaintiffs allege that CSC personnel invited and assisted Plaintiffs to come down a ramp so they could get in closer proximity to the players who were exiting the field through the tunnel, but then failed to assure their safety by failing to inspect the railings against which they knew Plaintiffs and others would be leaning, and to maintain a safe distance between the Plaintiffs and the railings. JA 69, 70 (Am. Compl. ¶¶ 77, 79). Plaintiffs also allege that CSC failed to secure the area in and around where Plaintiffs had fallen and failed to provide even a bare minimum of assistance to Plaintiffs—offering no medical assistance, physically dragging Plaintiffs out of the tunnel, and hoisting Plaintiffs back to the area in the stands from which they had fallen, among other things. JA 70-71 (Am. Compl. ¶¶ 81, 82). These allegations distinguish Plaintiffs' claims against CSC from their premises liability claims against WFT and the Stadium arising from faulty design, maintenance and/or inspection of railing system.[12] JA 66-68 (Am Compl. Count I).

The alleged intertwined relationship between the claims against WFT and the Stadium, on the one hand, and CSC on the other hand, does not exist and, therefore, does not justify compelling Plaintiffs to arbitrate their claims against CSC.

_____

[12] In addition to the claim against CSC being independent and self-sustaining, it is believed that the relationship of CSC to WFT and to the Stadium is not as close as a parent/subsidiary relationship or a corporation/shareholder relationship. *See, e.g., J&J Ryan & Sons, supra.* and *Long, supra.*

## VI.    CONCLUSION

For the reasons set forth, Plaintiffs respectfully request that the district court's

September 14th Order be affirmed in its entirety.

Dated:  January 29, 2024                    Respectfully submitted:

                                            */s/ Robert D. Sokolove, Esquire*
                                            Robert D. Sokolove
                                            rsokolove@wgpllp.com
                                            Jennifer Hiller Nimeroff
                                            jhiller@wgpllp.com
                                            WEIR GREENBLATT PIERCE LLP
                                            The Widener Building
                                            1339 Chestnut Street, Suite 500
                                            Philadelphia, PA 19107
                                            T:  (215) 665-8181
                                            F:  (215) 665-8464
                                            *Attorneys for Plaintiffs*

CERTIFICATION OF COMPLIANCE

I, Robert D. Sokolove, Esquire, certify that based on the word count system used to prepare the foregoing Brief of Appellee, that the Brief contains 9,987 words, exclusive of the parts of the document exempted by Fed.R.App.P. 32(f), and thus complies with the type-volume limits of Fed.R.App.P. 32(a)(7)(B)(i). I further certify that the Brief complies with the typeface requirements because it has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Robert D. Sokolove*
Robert D. Sokolove

CERTIFICATION OF SERVICE

I, Robert D. Sokolove, Esquire, hereby certify that on this 29th day of January, 2024, I caused the foregoing Brief of Appellee to be electronically filed with the Clerk of the Court of the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system.

I certify that all parties and other participants in this case are registered CM/ECF users and that service will be accomplished by and through the CM/ECF system.

/s/ Robert D. Sokolove
Robert D. Sokolove

Dated: January 29, 2024